633 So.2d 925 (1994)
STATE of Louisiana
v.
Bart Anthony STEWART.
No. KA 93 0708.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
*928 Doug Moreau, Dist. Atty. by Gwendolyn K. Brown, Asst. Dist. Atty., Baton Rouge, for appellee State of LA.
David Price, Public Defender, Baton Rouge, for appellant Bart Anthony Stewart.
Before CARTER, GONZALES and WHIPPLE, JJ.
GONZALES, Judge.
The defendant, Bart Anthony Stewart, was charged by grand jury indictment with first degree murder, in violation of La.R.S. 14:30. He pled not guilty and, after trial by jury, was found guilty as charged. In accordance with the recommendation of the jury, the defendant received a sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.[1] He has appealed, alleging nine assignments of error, as follows:
1. The trial court erred in sustaining the prosecutor's objection to a defense question seeking an expert opinion.
2. The trial court erred in denying the defendant's motion to suppress.
3. The trial court erred in granting the State's challenge for cause.
4. The trial court erred in denying the defendant's challenge for cause.
5. The trial court erred in refusing to allow the defense to present expert testimony of the inability of a retarded person who is intoxicated to form specific intent.
6. The trial court erred in denying the defendant's Batson objection to the State's use of peremptory challenges.
7. The trial court erred in denying the defendant's challenge for cause.
8. The trial court erred in denying the defendant's motion for a mistrial.
9. The trial court erred in refusing to allow the defense to present expert testimony at the trial.
Assignments of error numbers 3, 4, 7, and 8 were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
Sometime on the night of July 4, or the early morning hours of July 5, 1989, the defendant murdered a seventy-two-year-old woman, Mary Jenkins. Although the victim was not a blood relative, she had helped to raise the defendant. The murder took place in the victim's apartment on Hollywood Street in Baton Rouge. On a previous occasion, *929 the defendant had left a window unlatched to facilitate his later entry into the apartment. On the night in question, the defendant entered the victim's apartment through this unlatched window. He could not gain entry to the victim's bedroom because the door was locked. The defendant got a butcher knife from the kitchen and used it to open the bedroom door. As he rummaged through her bedroom looking for money, the victim awoke, recognized the defendant, and called his name. The defendant responded by savagely attacking the victim with the butcher knife, inflicting approximately seventeen stab wounds upon her. As the victim lay dead or dying on the floor, the defendant covered her face with an article of clothing and continued his search for valuables. He took approximately $80.00 in cash, three rings, and the victim's .22 pistol.
This murder remained unsolved for approximately two years before the defendant's girlfriend, Marquita Banks, contacted the police with information about the crime. The defendant had previously made statements about the murder to Ms. Banks. When she related this information to the police, they questioned the defendant. The defendant gave a detailed, tape recorded confession, wherein he admitted to the planning and commission of this offense. The defendant explained that he needed some money to pay a drug debt and committed this offense while high on cocaine. The defendant stated that, although he planned to steal money and valuables from the victim, he did not plan to kill her. He claimed that, when she awoke and called his name, he "just flipped." Several fingerprints taken during the crime scene investigation were reexamined and found to match those of the defendant.

ASSIGNMENT OF ERROR NO. ONE:
In this assignment of error, the defendant contends that the trial court erred in sustaining the State's objection to a question by defense counsel seeking an expert's opinion.
The defendant confessed to the instant offense on July 19, 1991. On November 8, 1992, the defendant was interviewed and tested by Dr. Edward Dougherty. At the motion to suppress hearing on November 9, 1992, Dr. Dougherty was qualified as an expert in special education, mental retardation, learning disabilities, and psychology. After Dr. Dougherty testified at the motion to suppress hearing about his examination of the defendant, defense counsel asked Dr. Dougherty to give an opinion on whether or not the defendant intelligently waived his rights and gave a confession. The prosecutor objected; and the trial court sustained the objection on the basis that the question related to the ultimate issue. Defense counsel commented that he believed the Code of Evidence allowed for expert testimony on an ultimate issue, whereupon the prosecutor explained that he had objected on a different basis. Specifically, the prosecutor noted that Dr. Dougherty had only examined the defendant on the previous day; and the prosecutor concluded that he was unable to render an expert opinion about the defendant's confession, which took place in July of 1991. The trial court sustained the prosecutor's objection on this basis.
At this point, defense counsel did not object to the trial court's ruling. Instead, defense counsel began asking Dr. Dougherty about the defendant's school records. When the prosecutor objected on the basis of a lack of proper foundation for the records, defense counsel explained that these school records allegedly indicated that the defendant had been in special education classes since 1982 and that his mental abilities had not changed since that time. In order to present further evidence on the foundation for the school records, the direct examination of Dr. Dougherty was temporarily stopped in order to allow defense counsel to question one of defendant's special education teachers, Lonnie Hilgerson. After questioning Mr. Hilgerson about the defendant's school records, defense counsel recalled Dr. Dougherty to the stand and questioned him about a computer program which he had used to analyze the reading grade level of the Miranda rights waiver form signed by the defendant on July 19, 1991. Dr. Dougherty explained that the computer results indicated the Miranda rights waiver form ranged from a sixth grade to a tenth grade reading level. Finally, after Dr. Dougherty testified that *930 the defendant was classified as mildly retarded or developmentally disabled based upon his IQ score and that his findings regarding the defendant were consistent with those of Dr. Marc Zimmermann, defense counsel ended his direct examination.
In his brief to this Court, the defendant contends that the trial court erred in preventing Dr. Dougherty from giving his expert opinion on the issue of whether or not the defendant had the mental capacity to understand and intelligently waive his Miranda rights. The defendant argues that, if Dr. Dougherty had been allowed to give his opinion and state his basis for that opinion, the trial court "would have been better able to make an informed decision on the motion to suppress." The defendant contends that, rather than refusing to hear Dr. Dougherty's opinion, the better practice would have been for the trial court to allow the testimony and subsequently reject it if the court concluded that there was not a sufficient factual basis for the expert's opinion.
Since this matter arose during a motion to suppress hearing, and there was no jury present, the defendant makes an interesting point. Perhaps it would have been better if the trial court had allowed Dr. Dougherty to give his opinion and, if the trial court later found for whatever reason that his opinion lacked a proper foundation or factual basis, the court could have rejected the evidence before making its ruling. Nevertheless, for the following reasons, we find no reversible error in this situation. Initially, we note that this issue cannot be raised on appeal. Defense counsel never made a contemporaneous objection to the trial court's ruling sustaining the prosecutor's objection to Dr. Dougherty's opinion testimony. La. C.Cr.P. art. 841; State v. Clayton, 427 So.2d 827, 834 (La.1982) (on rehearing). Not only did defense counsel fail to enter a contemporaneous objection, he did not make known to the trial court the substance of the expert opinion evidence that he was attempting to introduce. See Louisiana Code of Evidence art. 103 A(2). Furthermore, although defense counsel continued to question Dr. Dougherty after apparently laying a foundation that the doctor's opinion would be valid since the defendant's mental abilities had not appreciably changed since his enrollment in special education classes in the early to mid 1980's, defense counsel never again attempted to ask Dr. Dougherty to give his opinion on the defendant's mental ability to understand and waive his Miranda rights.
Moreover, even assuming that the trial court erred in sustaining the prosecutor's objection and preventing Dr. Dougherty from giving his opinion testimony, for the following reasons we find that any such error was harmless beyond a reasonable doubt. On cross-examination, the following colloquy occurred:
Q. But you have no information whatsoever to any way physically show this court that he is organically brain disabled; is that correct?
A. The results of my tests.
Q. But those are based upon self-reporting by the defendant.
A. No, they're not self-reporting. That is wrong. Self-reporting is where you give somebody a piece of paper and you ask themyou said personality tests, and basically they're asked questions and they say yes, no, or maybe, or something of that sort. None of these tests were that type. The tests that I gave, I asked the questions, I introduced the materials, I showed the pictures, I gave the puzzles, and he performed. And based on the results of those tests which are widely accepted in my field and meet the criteria of being valid and reliable, the results indicate that he has organic brain damage and he is mentally retarded and he has a reading level of third grade or less and he does not have the capacity to understand orally the complexity of the Miranda statement. (Underlining ours).
The underlined portion of Dr. Dougherty's answer to the prosecutor's question clearly contained his expert opinion on the defendant's mental capacity to understand and waive his Miranda rights. Therefore, since the expert gave his opinion, albeit on cross-examination, the trial court was made aware *931 of the opinion and the basis therefor; and, under these circumstances, any error in the previous ruling preventing this expert opinion testimony was harmless beyond a reasonable doubt. See La.C.Cr.P. art. 921; State v. Carter, 572 So.2d 1131, 1137 (La.App. 1st Cir.1990); State v. Revere, 572 So.2d 117, 134 (La.App. 1st Cir.1990), writ denied, 581 So.2d 703 (La.1991).
For the above reasons, this assignment of error is meritless.

ASSIGNMENT OF ERROR NO. TWO:
In this assignment of error, the defendant contends that the trial court erred in denying his motion to suppress his tape recorded confession. Specifically, the defendant contends that the State failed to prove he freely and voluntarily confessed after a knowing and intelligent waiver of his Miranda rights. The defendant argues that he lacked the mental capacity to understand and intelligently waive his Miranda rights and, therefore, his taped confession was not voluntary.
Both the State and the defense presented evidence at the motion to suppress hearing on the issue of the voluntariness of the defendant's confession. At the conclusion of this hearing, the trial court ruled that the confession was voluntarily, knowingly, and freely given after a waiver of Miranda rights and, therefore, was admissible at the trial.
It is well-settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menace, threats, inducements, or promises. La.R.S. 15:451. The State must specifically rebut a defendant's specific allegations of police misconduct in eliciting a confession. State v. Thomas, 461 So.2d 1253, 1256 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La.1985). Additionally, the State must show that an accused who makes a statement or confession during custodial interrogation was first advised of his Miranda rights. State v. King, 563 So.2d 449, 453 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990).
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. See State v. Patterson, 572 So.2d 1144, 1150 (La.App. 1st Cir.1990), writ denied, 577 So.2d 11 (La.1991); State v. Sanford, 569 So.2d 147, 150 (La.App. 1st Cir.1990), writ denied, 623 So.2d 1299 (La.1993). Whether or not a showing of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. State v. Benoit, 440 So.2d 129, 131 (La.1983). The trial court must consider the totality of the circumstances in deciding whether a confession is admissible. State v. Hernandez, 432 So.2d 350, 352 (La.App. 1st Cir.1983).
With regard to the relationship between diminished mental or intellectual capacity and involuntariness, the Louisiana Supreme Court has noted that such a condition does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Benoit, 440 So.2d at 131. The critical factors are whether or not the defendant was able to understand the rights explained to him and whether or not he voluntarily gave a statement. State v. Young, 576 So.2d 1048, 1053 (La.App. 1st Cir.), writ denied, 584 So.2d 679 (La.1991).
The State may rely on the presumption of sanity provided in La.R.S. 15:432, leaving to the defendant the initial burden of proving the existence of a mental abnormality which, under the circumstances, may have destroyed the voluntary nature of his confession. See State v. Waymire, 504 So.2d 953, 958 (La.App. 1st Cir.1987). Because a defendant is presumed competent, he has the burden of proving a mental defect such that he was unable to understand his Miranda rights and, therefore, incompetent to waive them. State v. Ondek, 584 So.2d 282, 292-293 (La.App. 1st Cir.), writ denied, 586 So.2d 539 (La.1991). Once such a mental defect is established, the State bears the ultimate burden of proving that the defendant's *932 mental defect did not preclude him from giving a voluntary and free confession with a knowledgeable and intelligent waiver of his rights. See State v. Istre, 407 So.2d 1183, 1186 (La.1981); State v. Young, 576 So.2d at 1053. However, if the defendant fails to prove the existence of a mental illness or defect, or fails to prove that such a disorder prevented his confession from being voluntary, while the State is not required to negate the defendant's mental abnormality, it still must in all other respects prove beyond a reasonable doubt that the confession was voluntary. State v. Lamark, 584 So.2d 686, 692 (La.App. 1st Cir.), writ denied, 586 So.2d 566 (La.1991).
At the motion to suppress hearing, Baton Rouge City Police Officers Ernie Brewer and Greg Phares testified that they were present when the defendant waived his Miranda rights and confessed to the murder. Officer Brewer testified that no promises, inducements, or threats were made prior to the confession and that the defendant was advised of his Miranda rights and signed a Miranda rights waiver form which was admitted into evidence as State Exhibit 1. Officer Brewer testified that the defendant appeared to understand each question on the Miranda rights waiver form and that he never requested an attorney or expressed an unwillingness to make a statement. He also identified a cassette tape (State Exhibit 2) as the tape containing the defendant's confession.
Officer Phares also testified that no promises, inducements, or threats were made in his presence. He testified that he read the Miranda rights waiver form (State Exhibit 1) to the defendant, who appeared to understand the rights being given to him. He testified that he made a notation on State Exhibit 1 that the defendant had an eleventh grade education from Istrouma High School and that he had received this information from the defendant.
The defense presented the testimony of Dr. Dougherty, Dr. Zimmermann (an expert in the field of psychology), and two of the defendant's special education teachers, Mr. Hilgerson and Ms. Marilyn Webb.
The testimony of Dr. Dougherty, an expert in special education, mental retardation, learning disabilities, and psychology, was partially summarized in the previous assignment of error. Based upon his interview and testing of the defendant, Dr. Dougherty testified that the defendant was mildly retarded with an IQ of 63, that he had been enrolled in special education classes, and that he functioned at a third grade level. Based on the above, Dr. Dougherty concluded that the defendant had brain damage. Dr. Dougherty testified that he examined State Exhibit 1, the Miranda rights waiver form signed by the defendant, using a computer program designed to measure the reading grade level of the language contained therein. He testified that State Exhibit 1 contained language ranging from a sixth grade to a tenth grade reading level, and he identified Defense Exhibit 1 as the results of the computer program which he used to test the reading grade level of the language in State Exhibit 1. Finally, he testified that he had discussed his findings concerning the defendant with Dr. Zimmermann and that their findings were consistent. As noted above, on cross-examination, Dr. Dougherty opined that the defendant did not have the mental capacity to understand the complexity of the Miranda rights waiver form.
Mr. Hilgerson testified that he was the defendant's special education teacher from 1988 to 1990. He indicated that the defendant functioned at approximately a third grade level, as indicated in the school records contained in Defense Exhibit 2. On cross-examination, Mr. Hilgerson testified that the defendant informed him that he had a job at a major restaurant in Baton Rouge, although Mr. Hilgerson could not remember the name of the restaurant or the type of duties which the defendant performed.
Ms. Webb testified that she was the defendant's special education teacher during the school year of 1989-1990. During that year, the defendant performed at approximately a 2.5 to 3.0 grade level.
Finally, Stacie Boutte, an East Baton Rouge Parish social worker, identified a group of school records as the special education evaluation file on the defendant. Pursuant *933 to her testimony, these records were introduced into evidence as Defense Exhibit 2.
On rebuttal, Officer Brewer was asked if he had been in the courtroom during the testimony of Drs. Dougherty and Zimmermann, and he replied that he had heard the majority of their testimony. When asked if their testimony about the defendant's intellectual abilities had changed his opinion that the defendant understood his Miranda rights, he answered in the negative. Officer Brewer explained that he had conversed with the defendant for several hours at the time of the confession and he was never aware that the defendant did not comprehend anything that was said or that he had a problem with anything that was said.
Baton Rouge City Police Officer Dennis Moran testified for the first time on rebuttal. Officer Moran testified that he first spoke to the defendant during the summer of 1989, shortly after the victim's death. He indicated that the defendant responded well to his questions and he did not get an indication that the defendant did not understand what they were talking about. Officer Moran also testified that he was present when the defendant waived his Miranda rights and confessed to the murder. When asked by the prosecutor if he came to believe that the defendant did not understand what he was doing, Officer Moran answered in the negative. When asked if he had ever been involved in a situation where a person did not understand the rights being given to him, Officer Moran replied in the affirmative. Finally, he testified that the defendant's confession was not such a situation, i.e., a situation in which the person did not understand the Miranda rights being administered to him. On cross-examination, Officer Moran indicated that the defendant made a statement that he understood each and every right that was given. Officer Moran indicated that he did not know the defendant was a special education student and that the only information he had received was the defendant's own statement that he was in the eleventh grade.
For the reasons which follow, we find that the trial court's ruling was correct. There is no doubt that the defense established that the defendant had brain damage, an IQ of 63 (classifying him as mildly retarded), and was enrolled in special education classes where he performed at approximately a third grade level. On the other hand, all three of the police officers present when the defendant confessed testified that the defendant appeared to understand what he was doing when he waived his Miranda rights and gave a detailed confession to the murder. There was testimony at the motion to suppress hearing that the defendant was employed, although the place of his employment and his particular duties were not revealed. In its ruling denying the motion to suppress, the trial court focused upon the language used by the defendant during his confession. The trial court concluded that the defendant understood the consequences of his actions and possessed the requisite intelligence to understand and waive his Miranda rights. After considering the entire record,[2] especially the tape recording of the defendant's confession, we agree with the trial court. During the confession, the defendant related specific details which occurred before, during and after the murder. He spoke in a fairly coherent manner and gave direct responses to questions asked by the police officers about waiving his Miranda rights and about the details of the crime.
This assignment of error is meritless.

ASSIGNMENTS OF ERRORS NOS. FIVE AND NINE:
In assignment of error number five, the defendant contends that the trial court erred in refusing to allow the defense to present expert testimony on the inability of a retarded person who is intoxicated to form specific intent. In assignment of error number nine, the defendant contends that the trial court erred in refusing to allow the defense to elicit expert testimony from Dr. Zimmermann. *934 Both of these assignments of error relate to the same ruling by the trial court and are considered together.
At the beginning of the trial, the defendant filed an amended answer to the State's request for discovery. The defendant notified the State of his intent to offer expert testimony relating to his mental capacity. Defense counsel explained that the expert testimony was offered under the authority of La.R.S. 14:15 and would show the effect of drugs or alcohol on Bart Stewart as a retarded person. The trial court ruled that it would allow evidence of intoxication as a defense but would not allow any type of diminished capacity defense. Both the State and the defense objected to the trial court's ruling.
At the trial, after the State rested its case, defense counsel announced his intention to introduce the expert testimony of Dr. Zimmermann (and perhaps Dr. Dougherty) in two areas. First, the defense intended to establish the effect of cocaine use on the defendant, a retarded person. Second, the defense intended to establish that the defendant's confession was involuntary due to his diminished mental capacity, combined with the coercion or duress of one and one-half to two hours of questioning by three police officers in a relatively small room.
Defense counsel offered Dr. Zimmermann as an expert in the fields of psychology, substance abuse, and chemical dependency. The prosecutor, defense counsel, and the trial court questioned Dr. Zimmermann. After this questioning, and after considering the arguments of counsel, the trial court ruled that the defense could not present expert opinion testimony in the two areas noted above. Instead, the defense was limited to introducing expert opinion testimony regarding voluntary intoxication as a defense. Defense counsel objected to the trial court's ruling and did not call either expert witness to the stand.
In his brief to this Court, the defendant states:
The issue is whether this evidence should be characterized as part of an intoxication defense admissible under R.S. 14:15, evidence of diminished capacity inadmissable (sic) under C.Cr.P. Article 651, or a hybrid, admissible but subject to a balancing test of probative value against prejudice.
....
After the state rested, appellant attempted to call as an expert witness, Dr. Mark (sic) Zimmerman (sic). The appellant offered him as an expert in the fields of psychology, substance abuse, and chemical dependency. The defense intended to have Dr. Zimmerman (sic) testify about the effects of crack cocaine on individuals generally and specifically on Bart Stewart.... He also would have testified about the effect of the interrogation procedure on Mr. Stewart. The state objected to the testimony. The court ruled the doctor could not testify because he did not have enough information on which to base an opinion.
For the reasons which follow, we find no error in the trial court's ruling. In issuing its ruling, the trial court did not indicate that Drs. Zimmermann and Dougherty could not testify on any matter whatsoever. Instead, the trial court merely ruled that the defense could elicit expert testimony solely in the area of voluntary intoxication as a means of defeating the necessary element of specific intent. In the instant case, the defendant entered a plea of not guilty. Therefore, because he did not enter a plea of not guilty and not guilty by reason of insanity, the trial court correctly ruled that the defense could not elicit expert opinion testimony regarding the defendant's mental capacity. La.C.Cr.P. art. 651; State v. Johnson, 475 So.2d 394, 397-398 (La.App. 1st Cir.), writ denied, 478 So.2d 143 (La.1985). Furthermore, Louisiana does not recognize the doctrine of diminished capacity. A mental defect or disorder short of legal insanity cannot serve to negate the necessary element of specific intent. State v. Pravata, 522 So.2d 606, 615 (La.App. 1st Cir.), writ denied, 531 So.2d 261 (La.1988).
The defendant concludes in his brief that the trial court ruled that Dr. Zimmermann could not testify regarding the defense of voluntary intoxication because the court *935 concluded he did not have enough information upon which to base an expert opinion. While admittedly the trial court's ruling in this matter was not crystal clear, it appears that the court would have allowed expert testimony, provided it was limited solely to a defense of voluntary intoxication and not combined with evidence of the defendant's mental capacity. In any event, even if some of the trial court's comments during its ruling could have been construed to mean that Dr. Zimmermann was prevented from giving expert testimony on voluntary intoxication because he lacked enough information upon which to base his opinion, we find that such a position was supported by the record. The only evidence of intoxication came from the defendant's own confession, wherein he admitted that he was under the influence of cocaine when he murdered the victim. However, as the trial court correctly noted, Dr. Zimmermann was not a medical doctor; and he had never observed the defendant under the influence of cocaine. Furthermore, there was no evidence introduced at the trial regarding the amount of cocaine used by the defendant or the amount of time between such use and the commission of the murder.
Finally, regarding defense counsel's attempt to offer expert opinion testimony on the defendant's ability to give a voluntary confession, the trial court ruled that such testimony was inadmissible. The trial court noted that the defendant had not testified at the motion to suppress hearing, nor had the defense even raised the issue of coercion or duress. Having previously denied the motion to suppress and ruled that the defendant's confession was admissible, we find no error in the trial court's ruling preventing the defense from attempting to offer expert testimony to show that the confession was somehow coerced or made under duress, regardless of whether or not a portion of such expert testimony related to the defendant's mental capacity.
For the above reasons, these assignments of error are meritless.

ASSIGNMENT OF ERROR NO. SIX:
In this assignment of error, the defendant contends that the trial court erred in denying his Batson objection to the State's use of peremptory challenges.
A peremptory challenge by the State may not be based solely upon the race of the juror. La.C.Cr.P. art. 795C. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. In Batson, the Supreme Court also set standards for assessing a prima facie case of purposeful discrimination and placed the burden on the prosecution, after such a prima facie showing, to come forth with a neutral explanation for challenging black jurors that related to the particular case. See State v. Collier, 553 So.2d 815, 817 (La.1989).
In Batson v. Kentucky, the United States Supreme Court held that a defendant may establish a prima facie case of discriminatory selection of the petit jury solely on evidence concerning the State's use of its peremptory challenges at the defendant's trial. In regard to the establishment of such a prima facie case, the Supreme Court stated the following:
To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280, [51 L.Ed.2d 498 (1977)] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, 345 U.S. [559], at 562, 73 S.Ct. [891], at 892 [97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This *936 combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
476 U.S. at 96, 106 S.Ct. at 1723.
In Powers v. Ohio, 499 U.S. 400, 611-618, 111 S.Ct. 1364, 1370-1373, 113 L.Ed.2d 411 (1991), a case involving a white defendant, the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, "a practice that forecloses a significant opportunity to participate in civic life." The Supreme Court further held that, while an individual juror does not have the right to sit on a particular petit jury, the juror possesses the right not to be excluded from serving on one on account of race; and the Supreme Court concluded that any defendant, regardless of his race, may raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. Consequently, the holding in Powers v. Ohio alleviates the initial showing required under Batson for establishment of a prima facie case of purposeful discrimination, i.e., that the defendant was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to remove venire members of the defendant's race. State v. Lamark, 584 So.2d 686, 695 n. 5 (La.App. 1st Cir.) writ denied, 586 So.2d 566 (La.1991). However, in all other respects, the defendant still must make a prima facie showing of discriminatory selection as required by Batson.
The trial judge must determine whether the defendant has established the requisite prima facie case of discriminatory selection. In making this determination, the trial judge should consider all relevant circumstances, including any pattern of strikes by the prosecutor against black jurors and any questions or statements by the prosecutor during voir dire examination or in exercising his challenges which may support or refute an inference of purposeful discrimination. Batson v. Kentucky, 476 U.S. at 96-97, 106 S.Ct. at 1722-1723; State v. Collier, 553 So.2d at 819.
Batson places the burden on the prosecution, after a prima facie showing of purposeful discrimination has been made, to come forward with a neutral explanation for challenging black jurors that is related to the particular case. State v. Collier, 553 So.2d at 817. Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.
The first voir dire panel consisted of six prospective jurors, four blacks and two whites. One black prospective juror, Clarcie Matthews, was dismissed by joint agreement because he was employed at the East Baton Rouge Parish Prison and was a reserve deputy. The prosecutor exercised three peremptory challenges against the three remaining black prospective jurors, Dora Early, Joyce Mason, and Daryl Lights. The defense entered a Batson objection, arguing that the prosecutor's peremptory challenges constituted a prima facie case of intentional discrimination on the basis of race. The trial court responded by initially noting that both sides had jointly agreed to dismiss the first black prospective juror, Mr. Matthews. Next, the trial court noted that the prosecutor previously had challenged Ms. Early and Ms. Mason for cause and he was now exercising peremptory challenges against them. Without actually ruling on the issue of whether or not the defense had established a prima facie case of discrimination, the trial court asked the prosecutor if he wished to state reasons for the release of Mr. Lights. After the prosecutor expressed his reasons for challenging Mr. Lights, the trial court ruled that the reasons were race neutral. The defendant objected that the prosecutor was not required to state his reasons for the peremptory challenges against Ms. Early and Ms. Mason. Noting that the prosecutor had already stated such reasons when he challenged these two prospective jurors for cause, the trial court asked the prosecutor to again state his reasons for exercising peremptory challenges against Ms. Early and Ms. Mason. After the prosecutor explained *937 his reasons for exercising peremptory challenges against these two prospective jurors, the trial court ruled that the reasons were race neutral and maintained the prosecutor's peremptory challenges.[3]
The reasons offered by the prosecutor to explain his peremptory challenges should be deemed race neutral unless a discriminatory intent was inherent in those reasons. Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866. In the instant case, the prosecutor initially challenged Ms. Early and Ms. Mason for cause because they originally indicated they could not vote for the death penalty in the case of a sixteen-year-old defendant. Although the defendant was nineteen at the time of the trial, he was sixteen when the instant offense was committed. In giving reasons for the peremptory challenge of Ms. Early, the prosecutor noted that she had an eighteen-year-old son. The prosecutor obviously believed that Ms. Early might think of her own son when considering the defendant's fate. The prosecutor noted that Ms. Early had an uncle who was serving a sentence for a murder conviction at the Louisiana State Penitentiary in Angola and noted that Ms. Early had visited individuals who were in jail. The prosecutor concluded that Ms. Early would not vote to sentence a sixteen-year-old to death.
The prosecutor indicated that he exercised a peremptory challenge against Ms. Mason because she did not correctly answer the jury questionnaire and was unable to satisfactorily explain where and how long she had been employed since high school. Furthermore, Ms. Mason had explained that the defendant's family environment would influence her decision, and she originally had indicated that she could not sentence a sixteen-year-old to the death penalty.
Concerning Mr. Lights, the prosecutor indicated that he was concerned about the fact that Mr. Lights knew Mr. Mitchell (one of the two defense attorneys) and might have known the defendant. The prosecutor noted that Mr. Lights had a fifteen-year-old son who was similar in age to the defendant at the time of the instant offense. The prosecutor also noted that Mr. Lights had a brother who was convicted of theft and served time at Hunt Correctional Institute.
In his brief to this Court, the defendant notes that the prosecutor included as one reason for challenging Mr. Lights that he viewed a television show entitled "Fresh Prince of Bel-Air." Additionally, the prosecutor included as a reason for challenging Ms. Early the fact that she watched a television show entitled "Family Matters." The defendant concludes that challenging a black prospective juror because he or she watched a particular minority oriented television show was an indication that the prosecutor's true reason for exercising his peremptory challenges was based on race. However, it should be noted that defense counsel was the only person during voir dire examination to question prospective jurors on such matters as their television viewing preferences, magazine subscriptions, and whether or not they had any particular bumper stickers on their vehicles. Considering all of the reasons expressed by the prosecutor for these three peremptory challenges, we note that the television viewing preferences of Ms. Early and Mr. Lights were not the primary reasons expressed by the prosecutor for exercising peremptory challenges against these prospective jurors.
Finally, concerning Ms. Mason, the defendant contends in his brief that "the statement that Ms. Mason's questionnaire was improperly filled out is conclusory and no specifics were given as to how the State believed the questionnaire was answered incorrectly." While the prosecutor did not go into detail about the incorrect answer by Ms. Mason on her prospective juror questionnaire when he was giving reasons for challenging her, our examination of the prospective juror questionnaire which she answered, as well as the *938 prosecutor's voir dire examination of her, reveals that she did answer a question incorrectly. Ms. Mason indicated on the questionnaire that she had never served on a jury. However, her following answer indicated that she had voted with the majority. On voir dire examination, the prosecutor specifically questioned Ms. Mason about this discrepancy. Therefore, contrary to the defendant's assertion in brief, the record supports the prosecutor's observation that Ms. Mason had incorrectly answered the prospective juror questionnaire.
Considering all of the above, we find that the prosecutor gave sufficient race neutral reasons for the peremptory challenge of all three of these black prospective jurors. Therefore, we find that the trial court correctly denied the defendant's Batson objection.
This assignment of error is meritless.
CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED. REMANDED WITH ORDER.
NOTES
[1] We note the following patent sentencing error. Neither the minutes nor the sentencing transcript show that the trial court, in imposing this sentence, gave the defendant credit for time spent in actual custody prior to sentencing. Such an allowance of credit is mandatory. La. C.Cr.P. art. 880. Accordingly, we find patent sentencing error and amend the sentence to reflect that the defendant is to be given credit for time served prior to the execution of his sentence. See State v. King, 604 So.2d 661, 670 (La.App. 1st Cir.1992). Resentencing is not required; however, we remand this case and order the district court to amend the commitment and minute entry of the sentence to reflect that the defendant is to be given credit for time served.
[2] In determining whether or not the ruling on the defendant's motion to suppress was correct, an appellate court is not limited to the evidence adduced at the hearing on that motion. Instead, this Court also may consider all pertinent evidence given at the trial of the case. State v. Merchant, 490 So.2d 336, 339 n. 2 (La.App. 1st Cir.), writ denied, 496 So.2d 326 (La.1986).
[3] In the instant case, the trial court never actually ruled on the issue of whether or not the defendant had established a prima facie showing of intentional discrimination. Nevertheless, once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether or not the defendant made a prima facie showing becomes moot. Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).