846 So.2d 913 (2003)
STATE of Louisiana
v.
Darrin RAIFORD.
No. 2003-K-0098.
Court of Appeal of Louisiana, Fourth Circuit.
April 23, 2003.
Writ Denied June 18, 2003.
*914 Eddie J. Jordan, Jr., District Attorney, Patricia D. Parker, Assistant District Attorney, New Orleans, LA, for Relator.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY.
MICHAEL E. KIRBY, Judge.
STATEMENT OF THE CASE
Darrin Raiford and Commodore Allen[1] were indicted on July 31, 1997 for first degree murder. It appears from the docket master that throughout 1998 discovery motions and changes of counsel delayed the proceedings. In 1999 Allen was found incompetent to proceed, apparently resulting in delays as to both defendants. On December 5, 2000, the court began to hear testimony in connection with Raiford's motion to suppress. Additional testimony was heard on February 7, 2001, and then a motion for a lunacy hearing was filed in March 2001. Testimony on the competency issue was heard on October 16, 2001, and the court found Raiford competent to proceed but left open the question of his competency to give a statement. On August 30, 2002, the court heard more testimony in connection with Raiford's motion to suppress his confession. Finally, on *915 November 21, 2002, the court granted the motion to suppress. The State objected and gave notice of intent to seek writs.[2]
STATEMENT OF THE FACTS
The defendant's statement, reflects that he was arrested for a carjacking which occurred on June 7, 1997 at 2:59 a.m. The narrative of the offense given by the defendant is that he, his codefendant Commodore, and a person named Chris were walking on St. Claude and saw a person about to exit a car. Chris told the defendant and Commodore that he was going to get the car. Chris carjacked the person, picked up the defendant and Commodore, and then drove to get gas. As they were driving on St. Roch, Chris saw some people he had had prior problems with and "went to shootin'." The three then left the scene, and as they were driving near Rumors, a nightclub, Chris parked the car, saying he saw some people he wanted to rob. That group was in a McDonald's parking lot. Chris told the defendant to get the victims' money when Chris pulled his gun and told the people to get down, so the defendant did. They also stole one of those victim's cars. After this robbery, the defendant, Chris, and Commodore went back to the Desire project where Chris lived and split up the jewelry they had taken. At some point shortly thereafter, Chris wanted to go back to retrieve the vehicle he had stolen in the first carjacking. When Chris and the defendant returned to the vicinity of the McDonald's, the police saw them. Chris ran, but the defendant did not and essentially surrendered to the police.
Also in his statement, the defendant stated that both Chris and Commodore were armed and fired their weapons at the group on St. Roch. In another part of his statement, the defendant indicated that it was Commodore, not Chris, who was driving the car at the time of the drive-by shooting; it is not clear from the statement when they changed places. The defendant denied having a gun, but admitted that he covered his face with his shirt while at the scene of the drive-by shooting. He later responded to more detailed questions about the first carjacking, stating that he and Commodore had walked off before Chris carjacked the victim, but then Chris drove around the block and picked them up.
The defendant was also questioned in some detail about his knowledge of other carjackings which may have been perpetrated by himself, Chris, or Commodore. The defendant denied participating in any others, but gave several details about carjackings perpetrated by Chris and Commodore.
Detective Michael Riley testified at the December 5, 2000 hearing relative to the eight counts of armed robbery and one count of carjacking. He responded to the call of the incident at the corner of St. Claude and Franklin Avenue, a McDonald's parking lot. As he was interviewing the eight victims, some of them suddenly pointed out to him that their vehicle, a Ford Bronco, was passing on the street. As Detective Riley prepared to pursue in his vehicle, several of the victims followed the Bronco on foot. Just as the detective was exiting the parking lot, the victims ran back, stating that two of the perpetrators had gotten out of the Bronco and started running towards the victims, causing them to retreat. Detective Riley instructed three of the victims to get into the police cruiser and then drove around looking for the subjects. At the corner of St. Claude and St. Roch, the victims pointed *916 out two African-American males, one of whom was the defendant Darrin Raiford. Detective Riley attempted to apprehend both subjects, but only the defendant, who made no attempt to flee, complied with detective's instructions. The second subject escaped on foot.
Detective Riley further testified that, in the defendant's pocket, he found a wristwatch which was identified by one of the victims. He also stated that he advised the defendant of "his rights as to the detainment, why he was being detained." The defendant's only statement to Detective Riley was to the effect that he understood that the detective was the police and that he did not know what was going on. At the time Detective Riley apprehended the defendant, he had no knowledge that the defendant had any connection with a shooting.
Sergeant Richard Williams testified at the December 5, 2000 hearing that he took a statement from the defendant on June 7, 1997. Also present during the taping were Detective Duane Carkum and the defendant's aunt, Shirley Raiford. Sgt. Williams testified that the defendant filled out a rights of arrestee form prior to giving a taped statement, and that he was not forced, coerced, or threatened. He also stated that the defendant was allowed to confer with his aunt during the taping of the statement.
During cross-examination, Sgt. Williams stated that at no time prior to the statement was the defendant advised that he was being arrested for a murder; his aunt also was not informed of his fact. He also stated that the tape was never turned off and the transcript did not indicate that there were any breaks. However, the sergeant did testify that the defendant was allowed to speak to his aunt prior to the statement, but he could not recall if it was outside the presence of police officers.
Detective Duane Carkum testified at the December 5th hearing that he was present during the defendant's statement; in fact he stated that he was the primary officer conducting the statement for the homicide case. Detective Carkum paraphrased the defendant's statement regarding the murder. The defendant said he was in a stolen vehicle with two other subjects. Those subjects confronted the victim, who was with a group in the St. Roch playground, and then began shooting at the group. They then drove away. According to Detective Carkum, the defendant was not forced, threatened or coerced to give a statement and appeared to appreciate his rights. The defendant's aunt also appeared to appreciate what was occurring, in the opinion of Detective Carkum.
The defendant's aunt, Shirley Raiford, testified when the motion hearing continued on February 7, 2001. Ms. Raiford first stated that the defendant is her sister's child, but that she had "raised him" and had him in her custody at one time. As to the incident, she testified that a uniformed officer came to the house, which was actually her father's house, seeking to speak to the defendant's grandfather because the defendant was in trouble. According to Ms. Raiford, the officer informed her and the defendant's uncle that "Darrin had told him that he was in the car with some guys that did some shooting, and some man had ID'ed him by the truck...".[3] Because the defendant's grandfather was ill, and because the defendant's mother was out of town, Ms. Raiford told *917 the police officer that she would come to the Fifth District, although she was "kind of upset and nervous".
Ms. Raiford stated that she drove herself to the district station, and when she arrived, she spoke with an officer who told her that her nephew was in a lot of trouble, specifically because he had been "with some guys in a car. They did a drive-by shooting," and that one of the victims had died. Ms. Raiford said that at that point she began crying and asked to see the defendant. When two detectives arrived, she was escorted to a room where the defendant was sitting and allowed to sit with him for a few minutes. She stated that she tried to ask him what happened, but "was just crying" and "couldn't hardly get nothing out" because she was so upset. One of the detectives came in and again told her that the defendant was in the car when a drive-by shooting occurred and the victim had died. The detectives then began the taped statement, giving the defendant his rights, and asking him questions. Ms. Raiford stated that the detectives were asking things very fast, including about a robbery across the river, so she asked them if there was time for them to call the defendant's mother. Ms. Raiford explained that she was upset and wanted to call the defendant's mother because she did not "want to do the wrong thing." Furthermore, she did not want to make any decisions for the defendant because he was not her child; she particularly did not want to sign any papers or anything. Ms. Raiford stated that the detectives offered to call the defendant's mother, who was in Mississippi, but were unsuccessful in reaching her.
In further testimony, Ms. Raiford stated that when she went to the police station she believed that the defendant had already made a statement. In fact, she stated that the police told her they needed adults present, but "that Darrin had already confessed, telling him that he was implicated in it." She also testified that when she was in the room with her nephew she did not discuss or talk to him about whether he should talk to the police because she was too upset, shaky, and crying. They never discussed any legal rights or anything; they were just crying. Ms. Raiford said that throughout the defendant's statement she just sat there crying.
On cross-examination, Ms. Raiford agreed that the police read the defendant his rights and that they did not force, threaten, or coerce him into giving a statement while she was present.
In addition to presenting the testimony of Ms. Raiford at the February 7, 2001 hearing, the defense called Dr. Fred Davis as a witness. After the court accepted him as an expert in psychology, he testified regarding his examination of the defendant with particular regard to his competency to execute a waiver of his rights. In addition to examining the defendant on September 18, 1998, July 7, 2000, and August 11, 2000, Dr. Davis reviewed the defendant's school records, listened to the tape statement[4], read the incident report, and reviewed the waiver of rights form. Dr. Davis administered a battery of tests, including "Trails A and B" which measure the ability to maintain set and shift set and also taps into processing speed, which the doctor explained involves the ability to develop a particular idea about how to approach something, continue to maintain that idea over a period of time, and then determine if there is a need to change that *918 idea. He also administered a word/color naming test to measure interference control, the Rey-Oesterith Complex Figures procedure to measure visual/spatial working memory storage and retrieval, and the Wexler Adult Intelligence Scale Form 3 and the Wexler Memory Scale Form 3, two tests used by the school system, so that he could compare results from the school records.
Dr. Davis testified that the defendant's school records indicated that he was found to be in need of special education because of a learning disability, but there was no IQ results because the test had not been administered. Specifically, the records showed that in 1992 the defendant was eleven years old and had repeated the first and third grades; he was in third grade at that time and was not passing. The records indicated that the defendant was living with his legal guardian Shirley Raiford, that he tended to forget easily what was learned, and had a very unstable relationship with his mother. The Woodcock-Johnson test reflected that at age eleven the defendant had an overall reading score at grade level 1.4, a math level of 3.4, and a writing level of 1.5. When Dr. Davis administered the same test in 1998, six years later, the defendant's performance level had risen only to 2.0 (second grade) in reading, while his math had dropped to 2.9 and his writing to 1.3. According to Dr. Davis, these results demonstrated that, despite more years in school, the defendant had not progressed. A report in the school records from June 1995 showed that the defendant had been diagnosed as mildly to moderately academically delayed and required virtually one-on-one with a teacher before he could be expected to learn.
Dr. Davis testified regarding the Wexler Adult Intelligence Scale which he administered to the defendant to assess general intelligence; the defendant showed a verbal IQ of 59, a performance IQ of 51, and a confidence interval of about 55 to 65 at the one percent level, which under the standard classification makes the defendant "trainably mentally retarded" but not "educably mentally retarded". Additionally, the defendant was tested for malingering, and that test reflected that he was not a malinger. The doctor also gave the defendant a new test called the "Validity Indicator Profile" developed by a doctor at a VA hospital. The defendant's answers on this test, which required him to make guesses, showed a random response pattern consistent with mental retardation. The results on the Wexler Memory test were also consistent with the IQ test results showing mental retardation.
Based on the various tests, examination of the defendant, records, and the way in which the defendant's rights were presented to him, Dr. Davis opined that the defendant would not have been able to understand the rights as presented to him. Dr. Davis explained that the problem for the defendant, as well as for other retarded persons whose information processing systems are impaired, is that he lacks the necessary working memory to absorb information and the abstract reasoning ability to think about the information he does retain.
Furthermore, Dr. Davis discussed that the defendant's confusion and lack of understanding was manifest during the taped statement when, after being read the line, "With full knowledge of my rights, I wish to waive all the privileges against self-incrimination and make a statement about my knowledge of the commission of the crime," the defendant's response was "No, sir." The officer then asked, "You don't want to give a statement?," to which the defendant responded, "What do you mean, sir?" This interchange showed the defendant's *919 confusion as did his subsequent response to the follow-up question of whether he wished to give a statement about his participation in the crime; the defendant asked the officer, "What like, that's like saying something like, no, you didn't want to do it or something like that?" Dr. Davis testified that this summarization reflected the defendant's "primitive and rudimentary understanding of what" was being asked of him. The doctor further explained that, given the defendant's limitations, it would be necessary to break down his rights one by one with many repetitions and simplifying the language used. Dr. Davis further stated that, in his opinion, the defendant could never make an intelligent decision alone to waive his rights given that his overall IQ is 51.
On cross-examination, Dr. Davis admitted that his report failed to note that the defendant's aunt was present during the statement and that this failure was an oversight. However, he explained that he had been asked to evaluate whether the defendant acting autonomously could make an intelligent and knowing waiver of his rights. As to the statement itself, Dr. Davis did not dispute that the police did not ask leading questions of the defendant.
The court also questioned Dr. Davis, eliciting the fact that the defendant has an IQ of 51, and that level could render the defendant incompetent to proceed. Dr. Davis further discussed the distinction between understanding rights and making the decision of whether or not they should be waived. Based on Dr. Davis's testimony that the defendant may be incompetent to proceed, the trial court on its own motion ordered the appointment of a lunacy commission to examine the defendant, including having an IQ test administered by Dr. Salcedo.
As ordered by the court, the court-appointed experts examined the defendant. These three doctors testified at the October 16, 2001 hearing. Dr. Salcedo, an expert in forensic psychology, testified that his examination and testing showed that the defendant was mentally retarded, specifically between the upper end of the mild, mentally retarded range and the lower end of the borderline range, or somewhere between 68 and 72. In terms of the State v. Bennett, 345 So.2d 1129 (La.1977) criteria for competency to proceed, the defendant was competent to proceed and assist counsel, although he demonstrated difficulty with processing information quickly enough to keep up with the pace of a trial. Dr. Salcedo indicated that through minor changes in the trial, this difficulty could be resolved. Dr. Salcedo further testified that he evaluated the defendant in terms of the ability to understand the rights given to him at the time he made his statement. The doctor stated that, in his opinion, "the unfortunate combination of Mr. Raiford's cognitive limitations, along with the style employed by the person who was reading his Miranda rights, made it such that ... Mr. Raiford did not realize or did not comprehend his Miranda rights or the rights that were explained to him, in the manner that they were explained to him at the time." Dr. Salcedo noted that the language used to explain the rights were "a lot of legal jargon" which clearly the defendant's educational background and cognitive limitations prevented him from following. Also, "unfortunately" in the doctor's opinion, the police officer "just sort of persisted in that approach of using a very technical, legal jargonese-oriented manner of explaining things to Mr. Raiford which it's apparent, based on his responses, that he didn't understand."
During cross-examination Dr. Salcedo testified, as Dr. Davis had, that if the defendant had been given his rights in a simpler more basic fashion, rather than *920 the way they were, then it might have been possible for him to understand them. Dr. Salcedo was also asked whether prior interaction with the police might have made it easier for the defendant to understand his rights because of the additional exposure; however, this triggered an objection by the defense counsel who indicated that the defendant's rap sheet reflected only a single juvenile arrest. After Dr. Salcedo testified, the parties stipulated that the defendant had prior arrest as a juvenile for simple battery, curfew violation, and being a runaway.
Dr. Richoux, a forensic psychiatrist, was the second court-appointed expert to testify. He stated that he participated in the examination of the defendant in March and April 2001. Dr. Richoux testified that he found the defendant to be "mentally impaired in terms of his level of intellectual functioning." Although Dr. Richoux did not personally administer any IQ tests to the defendant, on a clinical basis and after review of the defendant's records, he agreed with Dr. Salcedo that the defendant functions somewhere from the mildly mentally retarded to the lower borderline range. He further concurred with Dr. Salcedo that the defendant was competent to proceed to trial on a very basic level, although it might be necessary during trial to provide additional time for his counsel to explain the proceedings to him. As to the ability to waive his rights at the time he gave his statement, Dr. Richoux also concurred with Dr. Salcedo "that Mr. Raiford had major deficits in his ability to comprehend what was being said to him in terms of his legal rights.... He was told things and asked things, according to the transcript, ... in a form, and using verbiage which would certainly be over the head to a considerable degree of someone with Mr. Raiford's level of intellectual functioning ...". Dr. Richoux's opinion was based in part on the interview he conducted with the defendant. Dr. Richoux further testified during cross-examination that simply because the defendant responded that he understood his rights, it did not mean that he did. He also suggested that the defendant's attempt to ask what giving a statement meant reflected his "gross confusion".
The last court-appointed expert to testify was Dr. Sarah Deland, an expert in forensic psychiatry. Dr. Deland testified that she participated with Drs. Salcedo and Richoux in the March and April 2001 evaluations of the defendant. She separately examined the defendant again in September 2001 because, after the first two meetings, she was undecided on whether the defendant was competent to proceed under the Bennett criteria. In the last interview, the defendant appeared less anxious and showed a better understanding of the process, clearly because someone had been working with him. Based on this, Dr. Deland concurred in the determination by the other court-appointed experts that the defendant was competent to proceed. She was also in agreement with the other physicians that, with reasonable medical certainty in her opinion, the defendant did not understand the waiver of his rights when he gave his statement. Dr. Deland further agreed with Dr. Salcedo and Dr. Richoux's assessment of the defendant's level of intellectual functioning and that he had a learning disability.
At the conclusion of Dr. Deland's testimony and the defense introduction of the various exhibits identified throughout the hearings, the court ruled that the defendant was competent to stand trial. The court took the matter under advisement for a ruling on the motion to suppress confession, requesting that the parties provide memos. However, instead of ruling, on August 30, 2002 the court heard testimony from a Dr. Rennie Culver, an *921 expert in forensic psychiatry, who had been asked by the State to examine the defendant. Dr. Culver testified that he reviewed the defendant's taped statement, including the audio version, before interviewing him. During the interview, he took a history from the defendant and asked questions of the defendant to determine whether he understood his rights when they were read to him. Dr. Culver stated that this case was the first time he was asked to evaluate a defendant on the ability to waive his rights; in all the other cases his evaluation pertained to competency to stand trial or sanity at the time of the offense. According to Dr. Culver, he questioned the defendant about what occurred at the time he was arrested and the defendant stated that he was "questioned following an armed robbery in which a victim had been killed." The defendant claimed that the police had never read him his rights, that there were three other persons with him but only one other was caught, that the police tried to place dogs on him, that he was drunk when he was caught, and that he was questioned alone first and then with his aunt present. Dr. Culver stated that the defendant was able to recite his rights back "flawlessly". Dr. Culver further testified that the defendant told him that he was aware of his rights when he was arrested; the defendant said that, "As long as you don't use big words, I can understand what you say." Dr. Culver concluded that the defendant was competent to stand trial, that he did not suffer from psychosis or serious mental illness, that he does have mild mental retardation, and that he understood his rights at the time he was informed of them. This last opinion was based on the defendant's ability to understand his rights at the time of the interview, five years after the defendant's arrest, and from the audiotape which gave the doctor "the strong feeling that he understood them." Furthermore, Dr. Culver had been told that this case was not the first time the defendant had been arrested and he did not "think there was ever an issue made about his previous arrests, as to his competence to understand his rights." Dr. Culver also testified that he had reviewed the testimony of the court-appointed experts and he agreed that the defendant was competent to proceed, but disagreed with their determination on his ability to understand his rights at the time he gave a statement. Dr. Culver explained that such a disagreement "is the sort of thing that happens among experts."
On cross-examination, Dr. Culver stated that malingering was not an issue in this case. He admitted that he had not reviewed the testimony of Dr. Davis nor had the State provided him with all of the defendant's school records. He further testified that he never asked the defendant to explain to him what the various rights meant, he merely asked him to recite them. Dr. Culver stated that he did not "know how much plainer" the Miranda rights could be explained so he did not see the point in asking the defendant to do so. Dr. Culver was also unaware if the defendant had actually been given his rights at the time of his one other arrest, but assumed that he had been. Dr. Culver was unable to explain why he described the defendant's crime as a robbery during which the victim was shot when in fact it was an alleged drive-by shooting. Finally, Dr. Culver conceded that many times persons in jail are actually taught their rights, either by staff, jailhouse lawyers, or their own attorneys.
At the conclusion of Dr. Culver's testimony the court again took the matter under submission. On November 21, 2002, the court granted the motion to suppress the confession, while acknowledging the difficulty in making determinations of *922 competence in cases such as this one, especially where the experts do not agree.
DISCUSSION
The State is before this Court arguing that the trial court erred in suppressing the defendant's confession on the grounds that his mental retardation precluded him from making a knowing and voluntary waiver of his rights. The State makes an initial argument, in addition, that the procedural safeguards for the admission of a juvenile confession were met.
In State in the Interest of Dino, 359 So.2d 586, 594 (La.1978), the Louisiana Supreme Court held that, for the State to meet its burden of demonstrating that a waiver of Miranda rights by a juvenile was made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare prior to waiving his right to counsel and privilege against self-incrimination. However, in State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485, the Louisiana Supreme Court overruled Dino and reinstated the totality of the circumstances standard applicable to adults which prevailed as to juveniles prior to Dino. 96-2719 at p. 10, 712 So.2d at 490. This standard and the analysis to be used in the review of all confessions was restated by the court in State v. Vigne, p. 6, 2001-2940 (La.6/21/02), 820 So.2d 533, 537:
A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Thornton, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).
In cases involving allegations of diminished mental capacity, a defendant has the burden of proving the existence of any mental abnormality that might render his confession per se involuntary. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 279. However, although the defendant bears the burden of proving the existence of any mental abnormality which might *923 render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary and obtained pursuant to a knowing and intelligent waiver of the defendant's constitutional rights. State v. Brooks, 92-3331, p. 12, (La.1/17/95), 648 So.2d 366, 373 (Brooks 2), citing State v. Glover, 343 So.2d 118 (La.1977) (on rehearing).
In Brooks, the defendant had been subjected to several evaluations by both the defense and the State. Three I.Q. tests administered over a five year period showed scores of 67, 44, and 61. The State's experts, based on these scores, considered that Brooks was mildly retarded but functional. One of the State's experts also relied on the fact that Brooks had learned to drive in New Orleans and operated a forklift in conjunction with his employment for Goodwill. These accomplishments indicated a higher level of functioning than the tests scores may have. The defense experts, in contrast, believed that the defendant was moderately to severely retarded with possible brain damage. The court on review indicated that, if only the evidence to that point were considered, "there would be a real doubt concerning whether the State had sustained its burden of proof." Brooks, p. 14, 648 So.2d at 374. The court then reviewed other evidence, including testimony at the penalty phase of the defendant's trial. There, Dr. Juarez, the psychiatrist at Orleans Parish Prison, testified he had Brooks under his direct care several times during which the doctor saw evidence of malingering. Furthermore, while incarcerated and under Dr. Juarez's supervision, Brooks had been a tier representative responsible for approximately fifteen patient-inmates. Other experts testified that the defendant was possibly malingering or was capable of manipulation, including during the course of his confession. The court also considered defendant's confession itself and the extent to which its details were corroborated by the facts brought out at trial and found that to be "an additional factor for this Court to consider in evaluating the clarity of Brooks' mental processes at the time of his confession." Brooks, p. 15, 648 So.2d at 374. Therefore, because the trial court's ruling denying the motion to suppress the confession was supported by evidence in the record, it was affirmed.
The circumstances in Green were similar to those in Brooks except that, on appeal to this Court, this Court reversed the trial court's denial of the motion to suppress the confession. State v. Green, 92-2700 (La.App. 4th Cir.3/15/94), 634 So.2d 503 (Judge Byrnes dissenting). The testimony from the defense expert in Green is remarkably similar to that found in the instant case:
In support of his claim that he did not knowingly and intelligently waive his rights, at the motion to re-open the suppression hearing defendant presented the testimony of Dr. Mark Zimmerman, qualified as an expert in forensic psychology. He testified that he spent about nine hours testing and interviewing defendant. Dr. Zimmerman administered the following tests on defendant: 1) Benton Visual Retention Test, a test of perceptual motor abilities; 2) screening test for, and the Luria Nebraska Neuropsychological Battery, a test for brain dysfunction; 3) Weschler Adult Intelligent Scale, an intelligence test; 4) Wide Range Achievement Test, a test of academic abilities; 5) Personality Assessment Inventory, an objective personality test; 6) Minnesota Multiphasic Personality Inventory, an objective personality test; 7) Rorschach, a projective *924 personality test; 8) Mouse-Tree-Person Technique, a projective personality test.
Dr. Zimmerman found that defendant had an I.Q. of 65, which put him in the mildly mentally retarded range, or the educable range of retardation. Defendant's mental age is approximately ten years. Although defendant completed the ninth grade and was in the tenth grade when he dropped out of school, his functioning in reading and spelling is below the third grade level and in arithmetic is at the fifth grade level. Dr. Zimmerman also found brain dysfunction considering defendant's education level, with the parts of his brain affected being those associated with academic abilities and his ability to process informationhis intellectual abilities.
Dr. Zimmerman reviewed the waiver of rights form signed by defendant and went over it with defendant, and concluded that defendant found the form difficult to read and could not adequately explain many of the words on the form such as "privilege" and "waive". Reading the form to defendant at approximately the speed he heard on the taped confession, Dr. Zimmerman found that defendant could not keep up; he could not understand the form. Dr. Zimmerman stated that he thought defendant could be made to understand his Miranda rights, but it would be very difficult for him to understand using the wording on that particular waiver form.
Green, pp. 6-7, 634 So.2d at 507. Dr. Zimmerman also testified that Green would probably portray himself as understanding things that he did not so as to appear normal.
The State presented no expert testimony in Green. The police officer who obtained his confession testified that he was satisfied that the defendant understood his rights. The officer did not personally determine if the defendant could read or write. In reversing the trial court, this Court stated:
Given the uncontradicted testimony of Dr. Zimmerman establishing defendant's mental retardation and his brain dysfunction, we cannot find that defendant made a knowing and intelligent waiver of his constitutional rights. With Dr. Zimmerman's testimony that defendant simply did not have the intellectual capacity to understand those rights and, in fact, did not understand his rights, the trial court clearly erred in refusing to suppress defendant's confession due to his diminished mental capacity. Considering all of the evidence presented, the State failed to prove that defendant knowingly and intelligently waived his constitutional rights prior to confessing to the murder of Pamela Block.
Green, p. 8, 634 So.2d at 508.
On review, the Supreme Court noted that the issue presented by this Court's opinion concerned the defendant's ability to comprehend the Miranda rights. In considering whether the State met its burden of proving a knowing and intelligent waiver of his rights by the defendant, the court first noted that the detectives, who were experienced, Mirandized the defendant several times and "at no time did he articulate or in any other way evidence any lack of comprehension of his rights to remain silent or to have any attorney present." Green, p. 12, 655 So.2d at 281. Next, the court noted that the defendant's own two tape-recorded statements constituted "testimony" to show that the officers had read his rights to him and inquired if the defendant understood them; both times the defendant had expressly waived his rights. Id. The only evidence, in the court's view, which rebutted this evidence was the testimony of the defense expert. The court concluded that the State met its *925 burden. A factor, in the court's opinion, was that in the progression of the defendant's two statements, the first represented an attempt to exonerate himself from culpability for the murder, but, over time, the statements evolved as the defendant was presented with additional facts. The court found that this "evolution" revealed "a mental agility and adaptability which cannot be readily associated with the diminished capacity found by the court of appeal." Green, p. 15, 655 So.2d at 282. Furthermore, as in Brooks, the court considered "the extent to which extrinsic facts, i.e. the location of the gun, the details of the crime scene, etc., corroborated Green's ultimate confession." Id., at 283. The court further explained that the accuracy of the confession was not the issue:
However, when faced with a claim that the defendant's mental processes are so dysfunctional as to preclude a full understanding of those rights, any facts which shed light upon the functioning of that defendant's mental processes are relevant and pertinent evidence which the trial court is entitled to consider.
Green, p. 15, 655 So.2d at 283. The court further found that the trial court was justified in relying upon the defendant's familiarity with the criminal justice system because it tended to show that the custodial interrogation was not an experience foreign to Green, and that prior Boykinizations indicated a repeated exposure to Miranda rights and were relevant.
In State v. Anderson, 379 So.2d 735 (La.1980), the defendant was seventeen years old when apprehended in the course of a burglary. When he arrived at the police station, he was allowed to speak with his mother, who informed the police officer that the defendant was mentally retarded. Despite knowing this, the officer read the defendant his Miranda rights. The fact that the defendant did not understand "became apparent" to the police officer. Id. at 736. Another officer then read the waiver of rights form to the defendant and "attempted to explain each sentence to him in more simple terms." Id. The defendant gave a statement. At the subsequent motion to suppress hearing, the officer who had gone over the rights form with the defendant testified that, when he explained the rights in a simpler terms, the defendant appeared to understand. Also at the motion hearing, there was testimony showing that the defendant was unable to read, had a comprehension level equivalent to an eight-year old child, and had dropped out of school already. Testing showed that the defendant's I.Q. was between 50 and 69. The Supreme Court reversed the trial court's denial of the motion to suppress the confession, noting that the defendant was seventeen, that there was no evidence of employment or other factors showing his ability to communicate and be responsible, that the special education expert testified that the defendant's abilities had probably regressed since he had last been tested because he was no longer in school, and, finally, "even the testimony of the police officers ... was quite ambivalent as to whether defendant ever understood the rights which they attempted to explain to him." Anderson at 737.
In Anderson, the court distinguished an earlier case, State v. Collins, 370 So.2d 533 (La.1979), which involved a mildly retarded defendant with an I.Q. of 68, on the basis that there was expert testimony to show that, if the constitutional rights were explained, the defendant could understand them. Furthermore, the defendant had been able to earn a living and support a wife and children; he had also been the subject of police interrogation before. The court also noted that, during the instant investigation, his rights had been explained to him extensively several times.
*926 In State v. Pugh, pp. 19-21, 02-171 (La. App. 5 Cir. 10/16/02), 831 So.2d 341, 352-54, the Fifth Circuit recently was also faced with the issue of whether a mentally retarded defendant's confession should be suppressed:
The Louisiana Supreme Court has recognized that a diminished intellectual capacity does not, alone, vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. See, State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 126, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Benoit, 440 So.2d 129, 131 (La.1983). The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. Tart, supra; Benoit, supra.

* * *
In an earlier case [than Green], State v. Trudell, 350 So.2d 658 (La.1977), the Louisiana Supreme Court had concluded that the state proved that an "easily led and very suggestible" mentally retarded defendant with an I.Q. of 60 voluntarily made inculpatory statements. The defendant had twice been found incompetent to stand trial before ultimately being declared competent. In reaching the conclusion that the statements were voluntary, despite the defendant's mental illness, the Trudell court focused on the officers' testimony, the sanity commission reports indicating that the statements did not show psychosis, and because the individual statements which were made were, as the Trudell court stated, "lucid." Id. at 663.
In this case, the State presented evidence that the Defendant validly waived his Miranda rights through Detective Sacks' testimony. At the suppression hearing, the officer testified that, prior to the first statement, he advised the Defendant of his constitutional rights and that he read the Rights of Arrestee form to the Defendant, which the Defendant signed. According to Detective Sacks, the Defendant said that he understood these rights, wanted to waive his rights, and desired to make a statement. The Defendant told Detective Sacks that he had completed high school and could read and write. The form, which was introduced at the hearing, contains two signature lines, one indicating that the arrestee read the form, and one indicating that the arrestee understood the rights and desired to waive them. According to Detective Sacks, the Defendant placed his signature in both places. Detective Sacks testified that he had not threatened or coerced the Defendant and stated that he had made no promises to the Defendant.
Based on the foregoing, we find that the present case is similar to State v. Brown, 414 So.2d 689 (La.1982) and Green. In this case, there was no expert testimony that the Defendant was unable to understand his rights or the ramifications of waiving his rights when he made the statements. Dr. Gandle stated at trial that she was not testifying regarding Defendant's capacity on September 18, 1997, the day of the statements. Rather, the expert testimony related only to the Defendant's ability to apply his legal rights at trial. Further, the statements seemed lucid. They evidenced an understanding by the Defendant through his attempt to exculpate himself. There was no evidence of psychosis. Also, the Defendant had a familiarity with his rights from a previous court experience.
Thus, although the record supports that the Defendant had a diminished mental capacity, we do not find that the *927 Defendant proved that this mental defect robbed him of his ability to understand his rights and the consequences of the waiver of those rights. Therefore, we find no error in the trial court denial of the Defendant's motion to suppress his statements.
In State v. Brown, 414 So.2d 689, cited by the court in Pugh, the defendant was seventeen when he was arrested and a tenth grade high school student in special classes for the mentally retarded. While attending school, defendant had a part-time job as a bus boy in a local cafeteria. The defendant's I.Q. was between 65 and 75, and the testimony at the hearing and trial established that defendant was capable of distinguishing between right and wrong and of intelligently assisting in his defense. Two police officers testified that the defendant was repeatedly advised of his rights and that he indicated that he understood them. On appeal, after reviewing all of the evidence from the pretrial proceedings and trial, the Louisiana Supreme court concluded that it was unable to find that the trial court abused its great discretion in concluding that the defendant's statement was knowingly and voluntarily made. State v. Brown, 414 So.2d at 696.
In State v. Istre, 407 So.2d 1183 (La. 1981), the defendant was a borderline mentally retarded nineteen-year old accused of rape of his three-year old niece. He entered a dual plea of not guilty and not guilty by reason of insanity. The court-appointed expert testified that, due to the defendant's mental retardation, the stress of a custodial interrogation situation would enhance his inability to cope and understand the proceedings. The expert also stated that the defendant could understand technical words when time was taken to stop and discuss the concepts fully with him. The officer who obtained the defendant's statement admitted he was aware of the defendant's mental condition and asked one of the defendant's relatives to be present at the interrogation. Two other doctors testified that the defendant was competent to stand trial and that he could understand what was on the waiver of rights form; the defendant was also capable in their opinion to marry, raise a family, and pay bills. On appeal, the court relied, in addition to the above testimony, on the facts that the defendant had completed sixth grade and worked off shore. Furthermore, the defendant had nodded affirmatively throughout the time when he was being given his rights and the officers felt that he understood them. The court found that there was evidence to support the trial court's ruling denying the motion to suppress the confession.
In State v. Stewart, 93-0708 (La.App. 1 Cir. 3/11/94), 633 So.2d 925, a case mentioned by the trial court, two defense experts who had examined the defendant testified that he was classified as mildly retarded based on his IQ scores, and further, that he would have been unable to understand and intelligently waive his rights. The police officers who took the defendant's statement testified that the defendant said he had an eleventh grade education, that the defendant signed the waiver of rights form, that he appeared to understand each of his rights, and that he never indicated he did not wish to make a statement. On rebuttal at trial, one of the detectives testified that, at the time of the defendant's statement, he had conversed with him for several hours and that the defendant did not appear to have any problems comprehending anything. Additionally, there was testimony that the defendant was employed. In upholding the decision that the defendant's confession was valid, the appellate court noted these factors as well as its review of the confession itself, which showed that the defendant *928 "spoke in a fairly coherent manner and gave direct responses to questions asked by the police officers about waiving his Miranda rights and about the details of the crime." Stewart, 633 So.2d at 933.
In State v. Brown, 98-2214 (La.App. 4 Cir. 12/16/98), 753 So.2d 259, this Court in a pretrial writ decision upheld the trial court's ruling that the defendant had intelligently waived his rights. In that case, the same Dr. Davis who testified in the instant case stated that the defendant had a full-scale score of 68, a verbal I.Q. of 68, and a performance I.Q. of 70, and was reading at just under the second-grade level. Dr. Davis opined that the defendant could not understand his rights; this opinion was based in large part on the fact that the defendant showed a poor understanding of the Miranda rights when he read them to him from the waiver of rights form which conformed to the audiotape of defendant's confession. On review, this Court noted that the trial court heard testimony from a police detective who stated that he gave the defendant his Miranda warnings on three separate occasions, and, after learning defendant was illiterate, did so very slowly and deliberately. The third waiver was the one in the audiotaped statement upon which the trial court relied in denying the motion. Nowhere in that tape did the defendant express an inability to comprehend his rights. This Court also stated that a mere inability to read did not necessarily indicate that the defendant suffered from that level of diminished capacity necessary to vitiate his consent. Additionally, the fact that the defendant had three prior arrests was noted as relevant under Green. Finally, this Court reviewed the defendant's actual confession, which demonstrated a conscious attempt to minimize his own participation and avoid inculpating his co-perpetrator who was alive and whose name was unknown to the police, while shifting blame to the co-perpetrator who was deceased. The Court conceded that a different ruling could occur after a trial where other evidence might be adduced, but on the record before it, the trial court's ruling denying the motion to suppress evidence was not clearly erroneous.
As a review of the above cases shows, mental retardation alone is clearly not sufficient to find that the defendant could not waive his rights. On the other hand, it is also clear that a trial court's ruling is entitled to deference. The court here, relying apparently on the testimony of four of the five experts, found that the defendant was not capable of intelligently waiving his rights. Notable facts in addition to the expert testimony which would support the court's ruling were found in the statement itself; the defendant verbalized that he could not read and write very well and indicated that he did not understand what it meant to waive his right against self-incrimination. The taped statement does not indicate that the officers questioned the defendant about his education level after he said he had problems with reading and writing. The statement further showed that Shirley Raiford did not indicate she understood the rights; instead she was concerned about whether she personally had to sign something. Also, the parties stipulated that the defendant's juvenile record consisted of a single arrest for battery; the other contacts with the authorities were for a curfew violation and a runaway violation, the latter of which most probably did not warrant a detailed explanation of Miranda rights. Also, in contrast to the Green case, there was no indication here that the defendant had ever been brought before a court and pled guilty at which time both a judge and a defense attorney arguably would have educated the defendant on his rights.
*929 This case is also distinguishable from Brooks in that all the experts, including Dr. Culver, agreed that there was no issue of the defendant being a malingerer. Moreover, there was no testimony that the defendant was functioning in the jail environment at a level inconsistent with his school records (for example, that he had successfully obtained a G.E.D.). There was no evidence that the defendant had ever been employed.
This Court must consider the contents of the defendant's statement itself as a part of the totality of the circumstances. In that regard, because the State has not provided a police report or transcripts of general motion hearings, it is impossible to determine if the defendant's statement accurately reflects the actual crimes; it is also impossible to tell if the defendant consciously attempted to minimize his participation, a factor in some of the cases.[5] Notably, however, the defendant had apparently not been arrested for the murder associated with the drive-by shooting at the time he gave his statement, and thus the fact that his statement reflects no direct participation in that crime cannot, on the record before this Court, be evidence of a knowing attempt to exculpate himself. However, in his statement the defendant was able to give a relatively coherent account of the robberies which occurred that night, in particular when he was asked direct simple questions.
Interestingly, though, it appears that the defendant was more than willing to respond affirmatively to questions even though he might lack any independent knowledge of the answer. As an example, he had trouble naming the types of vehicles stolen during the robberies the night of the murder; he did not know if the first car was gray because it was painted or primed nor was he sure of the make; he also could not think of the term for the second vehicle stolen (it was a Bronco). When the officer referred to it several times as a Jeep, the defendant then used that term. Later, when he was being questioned about other vehicles stolen by Commodore and Chris, the defendant said he knew that they had taken "a [pause] with the top open;" the officer asked "A New Yorker?" and the defendant said yes. The officer then asked, "With the top open?" and the defendant said, "Yes, sir," although there is no apparent connection in description between a convertible and a New Yorker. Overall, however, the statement appears coherent.
As to the direct evidence presented by the State, Detective Riley testified that when he arrested the defendant he advised him of his rights as to the armed robbery but did not testify what those rights were nor did he testify that he attempted to ascertain whether the defendant understood them. Sergeant Williams testified that the defendant completed the waiver of rights form prior to giving a taped statement; in fact he testified that the defendant's completion of the form was reflected in the taped statement, even though the statement shows that the defendant said he could not read or write well so the sergeant read the form to the defendant. Detective Carkum testified that he was present and participated in questioning the defendant during his statement and that he believed the defendant understood his rights. However, there was no testimony from Detective Carkum that he made any attempt to break down the defendant's rights into simpler terms after the defendant manifested an inability to read and write, in contrast to Brown. Neither of the two police officers questioning the defendant *930 ever testified regarding his own experience in taking statements.
As the trial court recognized, this case presents a very difficult situation. The expert testimony overwhelmingly indicates that the defendant was not able to understand and intelligently waive his rights as given to him at the time he made his statement. The extrinsic evidence that would mitigate against those experts' opinions is minimal. On the record before this Court, we cannot say the trial court was manifestly erroneous.
CONCLUSION:
For the above and foregoing reasons we grant the state's writ but affirm the trial court's ruling suppressing the defendant's statement.
WRIT GRANTED; RELIEF DENIED.
BYRNES, C.J., dissents with reasons.
BYRNES, C.J., DISSENTS WITH REASONS:
I respectfully dissent based on my conclusion that the trial court erred in granting the defendant Darrin Raiford's motion to suppress his statement.
My review of the record convinces me that: (1) Raiford did not meet his burden of proving a mental defect that renders him unable to understand his rights and is therefore incapable of waiving them; and (2) the State met its ultimate burden of proving beyond a reasonable doubt that the confession was voluntary.

Motion Hearing
At the February 5, 2002 hearing on Raiford's motion to suppress his statement and evidence, New Orleans Police officers testified that they were involved in the apprehension of Raiford and Commodore Allen during the investigation of a carjacking, eight armed robberies and murder.
On June 7, 1997 the officers investigated a car-jacking reported at the corner of St. Claude and Franklin Avenues, in a McDonald's restaurant parking lot. At least eight individuals identified themselves as victims of an armed robbery. During the course of their conversation with Detective Michael Riley, several of the victims pointed to their car, an olive green Ford Bronco, as it was being driven towards Marais Street, the next street behind the restaurant. Several victims ran off in the direction of the Bronco while Detective Riley returned to his police cruiser and exited the restaurant parking lot. As he did so, the victims ran toward the cruiser and said that two people got out of the Bronco and began to chase the victims. Victims Craig Dunbar, Danny Ellis and Randy Brightland got into the back seat of the police cruiser and drove around looking for the perpetrators. The victims pointed out Raiford and another person at the corner of St. Claude Avenue and St. Roch Street. Raiford was apprehended and the other individual escaped.
Detective Riley found a wristwatch, identified by one of the victims, in Raiford's pocket. Detective Riley testified that he took Raiford into custody at that time, 3:44 a.m., according to the police report, and advised him verbally of his rights. He then took Raiford to the Fifth District Police Station. Detective Riley identified Raiford in court. Raiford made no statement before Detective Riley gave him his Miranda rights. At some point, Raiford told Detective Riley something to the effect that he didn't know what the officer was talking about. At that time, Detective Riley was not aware that a car-jacking of a Plymouth automobile had occurred earlier.
Sergeant Richard Williams testified that he was present when Raiford gave a sworn statement. Raiford was not questioned *931 until his aunt had been called, had arrived at the station and had conferred with her nephew. Sergeant Williams testified that he took the statement in connection with the multiple armed robbery investigation. Prior to giving the statement, Raiford filled out a rights of an arrestee or subject form. Sergeant Williams testified that Raiford was not forced, threatened or coerced to give the statement. He was allowed during the taping of the statement to confer with his aunt, who was present the entire time, and he was allowed to use the bathroom. According to the statement, Raiford gave his statement in the Fifth District police station at 7:41 a.m.
On cross-examination, Sergeant Williams testified that neither he nor any other officer in his presence, advised Raiford that he was being arrested for a murder in addition to the multiple armed robberies. At the time of questioning, Sergeant Williams testified that Raiford was under arrest for the armed robberies. Detective Duane Carkum, who was conducting the murder investigation, was present when Raiford gave his statement. When Sergeant Williams advised Raiford and his aunt of his rights, Raiford was told that he was under investigation for other crimes.
Detective Carkum testified that he was present and was the primary officer taking Raiford's statement in connection with the murder case. Detective Carkum confirmed Sergeant Williams' testimony that Raiford's aunt was present and fully understood the proceedings, and that Raiford was not forced, coerced or threatened to give his statement. He confirmed that he advised Raiford that he was conducting an investigation into a car-jacking. The rights of arrestee form indicates that Raiford had been arrested for an armed robbery. At that time, Raiford was not a suspect in the murder, but was thought to have information concerning the murder investigation. Detective Carkum testified that he was not advised that Raiford was a "possible suspect", but that Raiford had information. The detective did not know whether Raiford was a witness or participant or if he had heard something on the street. Defense counsel continued to attempt to characterize Raiford as a suspect in the murder; however, the detective testified that Raiford was not a suspect, but was thought only to have had information concerning the homicide case.
Detective Carkum identified a search warrant for a residence that Raiford pointed out as the place he met with two other men involved in the murder. The search resulted in recovery of silver earrings, a 1997 Kennedy High School class ring, four electronic pagers and a nylon holster. Ms. Pinky Burns, who lived at the residence, denied knowledge or ownership of the recovered items. The items are not evidence in the homicide case.
According to Detective Carkum, Raiford identified two persons were actually shot the car-jacking victim.

Standard of Review

Standard of Review of a Motion to Suppress
The appellate court reviews the district court's findings of fact on a motion to suppress under a clearly erroneous standard, and will review the district court's ultimate determination of Fourth Amendment reasonableness de novo. U.S. v. Seals, 987 F.2d 1102 (5 Cir.1993), cert. denied, 510 U.S. 853, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993). On mixed questions of law and fact, the appellate court reviews the underlying facts on an abuse of discretion standard, but reviews conclusions to be drawn from those facts de novo. United States v. O'Keefe, 128 F.3d 885 (5 Cir. 1997), cert. denied, 523 U.S. 1078, 118 S.Ct. *932 1525, 140 L.Ed.2d 676 (1998). An appellate court reviews the district court's determinations of reasonable suspicion and probable cause de novo. U.S. v. Green, 111 F.3d 515 (7 Cir.1997), cert. denied sub nom. Green v. U.S., 522 U.S. 973, 118 S.Ct. 427, 139 L.Ed.2d 328 (1997). Where the facts are not in dispute, the reviewing court must consider whether the trial court came to the proper legal determination under the undisputed facts. Maryland Cas. Co. v. Dixie Ins. Co., 622 So.2d 698 (La.App. 1 Cir.1993), writ denied 629 So.2d 1138 (La.1993).

Waiver of Miranda Rights
In cases that involve allegations of diminished mental capacity, although the defendant bears the burden of proving the existence of any mental abnormality which might render his confession per se involuntary, in the absence of such a showing the State retains the ultimate burden of proving beyond a reasonable doubt that the confession was voluntary. State v. Brooks, 92-3331, p. 12 (La.1/17/95), 648 So.2d 366, 373. In all cases, regardless of the applicable burden of proof, courts look to the "totality of the circumstances" surrounding a confession to determine its voluntariness. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 279, habeas corpus denied sub nom. Green v. Cain, 2002 WL 1974104 (E.D.La.2002). The "totality of the circumstances" includes the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Id. at 280. The trial court's determination that a statement was free and voluntary is entitled to great weight and will not be disturbed unless it is not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983).
At issue is the defendant's ability to comprehend his Miranda rights. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he has the right to remain silent and to consult with an attorney. To be admissible, the statement must be made with a knowing and intelligent waiver of those rights. Miranda, supra, 384 U.S. at 475, 86 S.Ct. at 1602. At the time the statement is made, the defendant must understand that he is entitled to protections under the law but the defendant decided to speak during a custodial interrogation. Green, supra, 655 So.2d at 280.
In the present case, Darrin Raiford expressly waived his Miranda rights. The issue remains as to whether the waiver was knowing and intelligent under the totality of the circumstances. The diminished intellectual capacity of the defendant is only one factor to be considered in determining whether the waiver of Miranda rights was knowing and intelligent. State v. Wilson, 467 So.2d 503 (La.1985), cert. denied sub nom. Wilson v. Louisiana, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985).

State v. Green
In the first-degree murder case, State v. Green, supra, the juvenile defendant's expert witness, forensic psychologist Dr. Mark Zimmerman, found that Green's Intelligence Quotient ("I.Q.") (Weschler) was around 65, making him "mildly retarded" but "educable." Dr. Zimmerman placed Green's "mental age" at around ten (10) years old, and diagnosed Green as suffering from "brain dysfunction." Dr. Zimmerman found Green's "concepts" and "receptive speech," i.e. "the ability to understand what is said to an individual" to be "impaired." Dr. Zimmerman testified that Green was unable to comprehend the rights of arrestee form read by the officer at the speed on the tape recording, and *933 that in any case certain key words, such as "privilege" or "waiver," were not readily understood by Green. Dr. Zimmerman also noted that many individuals with Green's mental capacity tended to agree that they understand things that they in fact failed to comprehend, for fear of being regarded as different from their peers. Id., 655 So.2d at 282.
The Louisiana Supreme Court looked at the totality of circumstances in finding that Green's statement was voluntary although Dr. Zimmerman opined that Green did not understand the rights he waived when he gave his statement. The Supreme Court referred to State v. Brown, 414 So.2d 689, 696 (La.1982), and stated that: "even moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights." Green, supra, 655 So.2d at 285. See also State v. Benoit, supra; State v. Ondek, 584 So.2d 282 (La.App. 1 Cir.1991), writ denied 586 So.2d 539 (La.1991). In Green, 655 So.2d at 282, the Louisiana Supreme Court cited Withrow v. Williams, 507 U.S. 680, 113 S.Ct. 1745, 1755, 123 L.Ed.2d 407 (1993), in which the United States Supreme Court stated that: "there is little reason to believe that the police today are unable, or even generally unwilling, to satisfy Miranda's requirements."
In Green, the Louisiana Supreme Court found that any facts that shed light on the functioning of a defendant's mental processes are relevant and pertinent evidence that can be considered. Id., 655 So.2d at 283. Factors included the point that the experienced officers consistently testified that Green appeared to understood his rights. [The testimony of police officers alone can be sufficient to prove the defendant's statements were freely and voluntarily given. State v. Pittman, 585 So.2d 591 (La.App. 4 Cir.1991), writ denied 586 So.2d 545 (La.1991).]
A further element was that Green had previously been Mirandized and Boykinized in the past so that he was familiar with the criminal justice process. This familiarity was relevant to the trial court's appreciation of Green's understanding of his rights. Green, 655 So.2d at 283.
A factor to be included in the totality of circumstances was that in his initial statement, Green tried to extricate himself from culpability, showing that he had the intelligence and understanding to manipulate the progress of the interrogation towards a result favorable to him. Id., 655 So.2d at 282. The Supreme Court found that Green's mental agility and adaptability could not be readily associated with a diminished mental capacity resulting in the failure to understand his waiver of Miranda rights. Id.
Another indication was that Green had the ability to alter his statement in response to new facts presented by the police. Id. An additional factor was that Green knew and conveyed the location of the gun and the details of the crime scene. Green had the capacity to accurately recall specific details of the crime scene. Id., 655 So.2d at 283.
Dr. Zimmerman's testimony was "uncontradicted" where the State presented no expert testimony to dispute Dr. Zimmerman's findings; however, the Supreme Court noted that: "the defense presented no hard medical evidence, e.g., psychiatric testimony, skull x-rays, cat scans, electroencephalogram results or other tangible diagnostic evidence of brain damage to substantiate Dr. Zimmerman's opinion." Id., 655 So.2d at 285. Under the totality of circumstances, the Louisiana Supreme Court reversed this Court's opinion, and held that the trial court properly found that Green was able to understand his *934 rights, and he knowingly and intelligently waived them.

State v. Stewart
In a first-degree murder case, State v. Stewart, 93-0708 (La.App. 1 Cir. 3/11/94), 633 So.2d 925, writ denied, 94-0860 (La.9/16/94), 642 So.2d 189, Stewart was tested by Dr. Edward Dougherty, an expert in special education, mental retardation, learning disabilities, and psychology. Dr. Dougherty testified that Stewart had an I.Q. of 63, was mildly retarded, had been in special education classes, and functioned at a third grade level. From these factors, Dr. Dougherty opined that Stewart had brain damage. From a computer program, Dr. Dougherty determined that the language in the rights of arrestee form ranged from a sixth to tenth grade reading level. On cross-examination, Dr. Dougherty testified that Stewart did not have the mental capacity to understand the complexity of the waiver of rights form.[1]
The First Circuit provided various factors indicating that Stewart was aware of the rights that he gave up when he made his statement. Included was the element that three officers, who were present during the confession, gave their experienced opinions that Stewart "appeared to understand what he was doing when he waived his Miranda rights and gave a detailed confession to the murder." Id., 633 So.2d at 932. Officer Brewer indicated that Stewart understood each question on the form and he never requested an attorney or expressed an unwillingness to make a statement. Id. Officer Phares testified that he made a notation on the waiver of rights form that Stewart gave information that he had an eleventh grade education from Istrouma High School. Officer Moran did not know that Stewart was a special education student and he only had the information from Stewart's statement that he was in the eleventh grade.
One of Stewart's special education teachers testified that Stewart informed him that he had a job at a major restaurant but the teacher did not remember what restaurant or what were Stewart's duties.
The First Circuit emphasized that the trial court "focused upon the language used by the defendant during his confession." Id., 633 So.2d at 933. The First *935 Circuit affirmed the trial court's ruling that Stewart was capable of understanding the waiver of his Miranda rights under the totality of circumstances.

State v. Brown
In State v. Brown, 98-2214 (La.App. 4 Cir. 12/16/98), 753 So.2d 259, writ denied, 99-0151 (La.3/19/99), 740 So.2d 113, on granting the writ application, this Court denied relief and affirmed the trial court's finding that Brown's statement was free and voluntary. The defendant's expert in the field of psychology, Dr. Fred Davis, testified that Brown had a full-scale score of 68, a verbal I.Q. of 68, and a performance I.Q. of 70. Brown's overall scales were at the third grade level and his written language score was at the first grade level. A test designed to show the capability of understanding the spoken language showed that Brown scored at the second grade level. Based on the Miranda rights given on the audiotape, Dr. Davis opined that Brown would not have been able to understand and voluntarily waive his rights under the circumstances in which they were presented. Brown would not have been able to understand the rights unless paraphrased. Dr. Davis remarked that an average first grader would most likely say that he understood his rights.
This Court pointed out that Sergeant Little gave Brown his Miranda rights three times: at the time of Brown's arrest, at the station when Brown signed the waiver of rights form, and again at the beginning of the taped statement. Brown never expressed his inability to comprehend his rights. Sergeant Little did not know Brown's educational level; however, when Brown said he could not read, the sergeant advised Brown of his rights slowly. Sergeant Little did not ask Brown to explain the rights back to him.
Brown had been arrested on three prior occasions and presumably been given his Miranda rights. This Court found that Brown's "attempt to exculpate himself from the more serious aspects of the alleged repeated criminal conduct while confessing to the more generic role of bystander" shows his capability. Id., 753 So.2d at 263.
Although Dr. Davis' testimony was "uncontradicted", this Court concluded that: "it is conceivable that the trial court accepted Dr. Davis' testimony as true, but found the other circumstances surrounding the confession indicated that defendant knowingly and intelligently waived his Miranda rights." Id., 753 So.2d at 264. This Court also noted in Brown that: "Other evidence might be adduced at the future trial that more persuasively bears on the defendant's competency ..." Id.

State v. Brown
In State v. Brown, 445 So.2d 456 (La. App. 5 Cir.1984), although the sanity commission doctors agreed that Brown's I.Q. was 54, that Brown would not be a functional reader and his writing would be restricted, the Fifth Circuit upheld the trial court's ruling that Brown's statement was admissible as freely and voluntarily given.

Experts' Testimony

Dr. Fred Davis
In the present case, Dr. Fred Davis, the defendant's expert in psychology, determined that Raiford's I.Q. was 51, he was mildly mentally retarded, functionally illiterate, and in need of special education placement. Dr. Davis explained that Raiford was "trainably" mentally retarded and not capable of learning through instructions but needed close supervision. The Miranda rights would have to be repeated a number of times, have to be broken down into their individual components, and *936 the language would have to be converted. Raiford was not malingering, i.e., he was not feigning his lack of understanding. Although Raiford had difficulty comprehending spoken and written language, he could recall events that he was involved in, as part of his episodic memory.
Dr. Davis stated: "I agree with you that Mr. Raiford does have in his history examples of highly responsible behavior within the family and caring for other kids and things of that nature. That does not mean that he can comprehend the rights statement."
The trial court remarked that: "The critical piece in the statement is the right to remain silent, simply the fact that, does he understand that he didn't have to make a statement."
Dr. Davis replied: "Yes, I'm sure he understood the nature of it.... I'm sure he understood that he could be quiet if he wanted to." However, Dr. Davis found that Raiford was not capable of understanding the implications and consequences resulting from speaking. Dr. Davis opined:
But assuming that all the things that he said in that transcript actually happened, did he understand that when he told the police that, that he was going to be charged the same as them [the other suspects], and he was going to go to jail the same as them. I don't think he is capable of making that kind of mental conclusion. I don't think he has the ability, the competence to fully appreciate what happens to him if he waives his rights. So to me, way beyond whether or not you have to say anything, it goes to does he understand what can happen to him if he reveals certain information. So that is, if he knows what's against the law and what's not against the law, that he knows that somebody in a car with him and pulls the trigger and shoots somebody, he can be charged with murder. All those different kinds of issues that would affect a person's decision to give information to the police or not. My opinion is he does not have that capability. [Emphasis added.]
Dr. Davis' comments about Raiford's lack of realizing the implications, ramifications and knowledge of the law are not necessarily a bar to a determination that Raiford was able to waive his rights voluntarily. Individuals with normal intelligence may not know the law that persons in a car with an individual who shoots another on the street, may be charged with murder as principals or accessories. The State must prove the elements of the offense, including specific intent.
La. R.S. 14:17 provides:
§ 17. Mistake of law
Ignorance of the provision of this Code or of any criminal statute is not a defense to any criminal prosecution. However, mistake of law which results in the lack of an intention that consequences which are criminal shall follow, is a defense to a criminal prosecution under the following circumstances:
(1) Where the offender reasonably relied on the act of the legislature in repealing an existing criminal provision, or in otherwise purporting to make the offender's conduct lawful; or
(2) Where the offender reasonably relied on a final judgment of a competent court of last resort that a provision making the conduct in question criminal was unconstitutional.
Ignorance of the law or understanding the implications of the law is not controlling or dispositive of whether an individual understands his waiver of rights.
*937 Dr. Davis would not say that Raiford is competent to stand trial. Dr. Davis stated that:
... So if a person is found not competent to waive Miranda rights, they are also not competent to enter into a plea bargain. They are not competent to waive a jury trial. They are not competent to do anything that involves a waiver of rights autonomously, on their own, independently. Now, a representative; an attorney, a family member, someone who is representing and making the decision for him, could make that decision for him, but he cannot make that decision.... But I would say from my perspective that if he's not competent at one point of the process, he's not competent at any point in the process. [Emphasis added.]
Thereafter, the trial court ordered a competency or lunacy hearing to determine if Raiford is competent to proceed in this case. At the competency hearing on October 16, 2001, Dr. Raphael Salcedo, Dr. Richard Richoud, and Dr. Sarah Deland testified.

Dr. Rapheal Salcedo
Dr. Raphael Salcedo, an expert in the field of forensic psychology, stated that Raiford was "functioning within the lower end of the borderline range, upper end of the mild, mentally retarded range, based on clinical examination primarily, because his learning disability would confound the issue of his true intellectual potential....[S]omewhere between 68 and 72 is probably where his true intellectual potential falls." Dr. Salcedo found that in terms of the Bennett criteria, Raiford was competent to proceed and to assist his counsel in this case. If Raiford had difficulty in keeping up, the pace could be slowed down. Counsel should have an opportunity to explain the proceedings to Raiford in terms that he can understand. Dr. Salcedo remarked: "But otherwise, I felt that he demonstrated an adequate understanding of the nature of the charges."
However, Dr. Salcedo stated: "I believe Mr. Raiford did not realize or did not comprehend his Miranda rights or the rights that were explained to him, in the manner that they were explained to him at that time." Dr. Salcedo did not listen to the tape but reviewed the transcript. He pointed out that the officer used "a very technical, legal jargonese-oriented manner of explaining things to Mr. Raiford which it's apparent, based on his responses, that he didn't understand.... With what I knew of him beforehand for the competency issue, things have to be explained a couple of times in real simple terms...."
Dr. Salcedo referred to the fact that Raiford responded "huh" to what was "a very complex, lengthy, compound sort of question."
Before Raiford began giving his statement, Sergeant Williams advised Raiford as follows:
Darrin, let me advise you of your rights, right now you are under arrest for [the] alleged violation of revised statute of 1950, article 64, relative to arm[ed] robbery. The possibility of your participation in other crimes is also under investigation. According to provisions in the constitutions of the United States and of the State of Louisiana, it is my duty to inform you that: You need not make any statements [that] is, you have the right to remain silent. Anything you say maybe [sic] used against you in trial. You have a right to consult with and obtain the advise of an attorney, before answering any questions. If you cannot afford an attorney[,] the court will, will [sic] obtain an attorney to represent and advise you. You have the right to have your attorney ... present at the time of any questioning or giving *938 of any statement. Do you understand what I just read to you?
Raiford replied, "Yes, sir." When asked if he could read and right, and Raiford answered: "Not that good sir." The officer continued:
BY THE OFFICER:
Q. All right I'll read it for you. I understand what has been read to me and with knowledge of my rights, I wish to waive all privileges against self-incrimination, and make a statement about my knowledge of the commission of this crime. Is that what you wish to do?
BY MR. RAIFORD:
A. No sir.
BY THE OFFICER:
Q. You don't wish to give a statement?
BY MR. RAIFORD:
A. ... What you mean sir.
BY THE OFFICER:
Q. You wish to give a statement about your participation in the crime?
BY MR. RAIFORD:
A. What like, that's like saying something like, no you didn't want to do it, or something like that.
BY THE OFFICER:
Q. Just telling us whatever happen[ed], telling us about what happen[ed].
BY MR. RAIFORD:
A. Oh, yes sir.
BY THE OFFICER:
Q. Is that what you wish to do?
BY MR. RAIFORD:
A. Yes.
The language on the rights form that "I wish to waive all privileges against self-incrimination" would be difficult to understand for someone who was not familiar with legal terms; however, the language of the Miranda rights to remain silent, etc., were provided previously in simple terms that Raiford answered that he understood. The Miranda rights were given to Raiford in simple terms when he was arrested in this case and when he was read the rights of arrestee form. He heard the same rights given to his aunt another time. During the competency hearing, the defense attorney stated: "It is my understanding Mr. Raiford was arrested once before as a juvenile for a fight." The defense attorney later stated: "I would like to introduce the arrest register or the rap sheet of Mr. Raiford, or obtain a stipulation from the State of previous arrests prior to the date in question were as a juvenile; for simple battery, a curfew and a runaway violation." The State agreed to the stipulation. Raiford previously had been arrested and probably had been given his Miranda rights before the present arrest occurred in this case.

Dr. Richard Richoud
Dr. Richard Richoud, an expert in the field of forensic psychiatry, agreed with Dr. Salcedo's findings, signed his report, and they issued a joint report. Dr. Richoud also recommended that Raiford be found competent to stand trial. In Dr. Richoud's opinion, Raiford could not voluntarily waive his Miranda rights. Dr. Richoud felt that whenever detectives question individuals, they should get the individual suspects to recite their rights. Dr. Richoud explained that:
... I'm saying it is my opinion that simply by hearing someone respond, yes, to a question concerning whether they understand a certain thing does not enable the person receiving that response to know what it is that individual truly understands. I'm not saying that because somebody responds, yes, I would conclude that the true answer was, no. I'm saying that because they respond, yes, that would not enable me *939 to know what, in fact, that individual does or does not comprehend.

Dr. Sarah Deland
Dr. Sarah Deland, the third member of the lunacy commission, was qualified as an expert in forensic psychiatry. She concluded that Raiford understands the proceedings and can assist his attorney at trial; however, she did not think that he understood the waiving of his Miranda rights. Dr. Deland determined that Raiford's I.Q. was 68-75. She noted that Raiford has a substance abuse disorder and a learning disability. Dr. Deland stated: "And so it is hard to know just because somebody says, yes or no, how much they do understand and what they don't understand. It's really impossible to tell."

Dr. Rennie W. Culver
On August 30, 2002, Dr. Rennie W. Culver testified as the State's expert in the field of forensic psychiatry. His credentials included a Ph.D. in English and an M.D. in psychiatry. He found that Raiford was competent to stand trial. Raiford said that he was never read his rights, the police tried to sick dogs on him, and he was drunk when he got caught.[2] He was examined alone and then with his aunt present. Dr. Culver noted that Raiford said the officers never read him his rights although "that isn't what's in the tape." When Dr. Culver asked Raiford to verbalize his rights, "[h]e replied: to remain silent; anything can be said [sic] against you; to have an attorney and they'll get you an attorney if you don't have one. I asked him if he was aware of these rights at the time he was arrested. And his reply was, yeah; I knew that. As long as you don't use big words, I can understand what you say." [Emphasis added.][3]
Dr. Culver explained:
Well, I concluded that he was certainly competent to stand trial and that there was no evidence that he suffered from psychosis or any serious mental illness. He does have mild mental retardation. There's no question of that. I estimated him to be mildly retarded. And I understand from what the other experts who said that his I.Q. is somewhere around 68, 70, somewhere in that range; which was consistent with my own observation, given the history he gave me and his vocabulary and his demeanor. I concluded that he certainly does not have anything organically wrong in the sense that he's, say, had a serious head injury and is impaired in his reasoning or thinking as a result of that. There's no history of that. And I concluded that he did understand his rights at the time that he was informed of them.
Dr. Culver affirmed that he was aware of Raiford's educational background. When asked how far Raiford went in school, Dr. Culver replied: "Tenth grade." Dr. Culver was aware of Raiford's learning disability. Malingering was not an issue in Raiford's case.
Dr. Culver reasoned: "I'm not convinced that having him paraphrase that statement is going to prove or disprove anything. Because how much plainer could be: to remain silent.... To remain silent I think speaks for itself. It's only three words and none of them are big words." Dr. *940 Culver was asked about the wording "anything you said could be held against you." Dr. Culver responded that: "I don't know how much plainer it could be phrased." Dr. Culver noted that Raiford "said that he was arrested in 1996 on a stolen car charge and jailed for a week before the charges were refused.... And he said he had not been arrested on any other occasions."
Dr. Culver concluded that Raiford understood his rights at the time he was informed of them, and stated that "listening to the tape gave me the strong feeling that he understood [his rights]. Raiford's demeanor indicated that he understood what was going on."
The experts' testimony differed. Dr. Davis found that Raiford's I.Q. was about 51 while the other experts concluded that his I.Q. was around 68-72. Dr. Davis found that if Raiford was incapable of understanding the implications of giving up his Miranda rights, he was also not competent to understand court proceedings at trial unless he had the assistance of an attorney, a relative or a concerned adult. Dr. Salcedo, Dr. Richoud, and Dr. Deland agreed that Raiford could proceed to trial at a slow pace with the help of his counsel to explain the events. Dr. Culver concluded that Raiford's waiver of his Miranda rights was voluntary, and Raiford could proceed to trial.
In the present case the defense points out that four of the five experts found that Raiford did not have the mental capacity to understand the waiver of his Miranda rights. Even though the experts concluded that the defendants were not capable of waiving those rights, and the expert testimony was uncontradicted in State v. Green, supra, State v. Stewart, supra, and State v. Brown, supra, reviewed above, the defendants were found to have voluntarily given their statements under the totality of circumstances. Those defendants had similar learning disabilities that Raiford had, and the defendants had similar or lower I.Q.'s. The experts found that Raiford could be helped to understand his rights with the assistance of a concerned adult or an attorney. Darrin Raiford's aunt was present when the officers read him and his aunt the Miranda rights, and Darrin Raiford made his statement.

Focus on Raiford's Statement
As previously noted, in State v. Stewart, supra, 633 So.2d at 933, in affirming that Stewart's waiver of his Miranda rights was voluntary, the First Circuit emphasized that the trial court "focused upon the language used by the defendant during his confession."
In the present case, the transcript of Raiford's statement shows that the officers did not present leading questions. Raiford recalled earlier events and was able to ask for clarification. When asked, "You wish to give a statement about your participation in the crime?" Raiford asked, "What like, that's like saying something like, no you didn't want to do it, or something like that." When asked if Raiford and the other perpetrators covered their faces, Raiford indicated that he wanted to know which incident (during the drive-by shooting or the robbery in McDonald's parking lot). Raiford was able to relate the events of the two crimes that occurred consecutively at different locations.
Raiford gave specific details during his statement, and described the events as they occurred. During the robbery of the victims at McDonald's, Raiford said, "I had a shirt around my face. Chris had a scarf around his face, Commodore had a scarf around his face, sir." This indicates that Raiford had the mental capability to hide his identity during the holdup. He described the other two suspects' clothing during the events of the present charges.
*941 Raiford was aware of the difference between the two guns used by the other two suspects. When the officer asked how many guns he saw, Raiford replied, "A 38 and a 9 sir." Raiford responded that Commodore had the 38 and Chris had the 9. Later, Raiford replied, "No sir," when asked if he knew the difference between an automatic and a revolver. The following questioning occurred:
BY THE OFFICER:
Q. Do you know a 9 mm when you see one?
BY MR. RAIFORD:
A. Yes sir.
BY THE OFFICER:
Q. Do you know a 38 when you see one?
BY MR. RAIFORD:
A. Yes sir.
BY THE OFFICER:
Q. What color were they?
BY MR. RAIFORD:
A. They uh ... [the] 9 was black and silver, and the 38 was black with a brown handle.
During his statement, Raiford said that he was aware that previously the other two suspects came around his house in vehicles they had carjacked although Raiford was not with them. Raiford had not seen them rob or shoot anyone before, but Raiford said that they showed him jewelry they took in robberies. Raiford described two other cars the two other suspects had taken. The record shows that Detective Carkum testified that Raiford gave the address, Apartment C, 3324 Alvar Street, which was used for the search warrant, and where jewelry and other items were found. Raiford was aware of the other suspects' prior criminal activity; he knew the difference between the two guns used; and he gave information about the specific address of the location where some of the stolen items were found. These specific details of Raifford's statement are indicators that Raiford had the mental capacity to understand that his statement was voluntary under the totality of circumstances.

Police Detectives' Testimony
Detective Michael Riley took Raiford into custody on the morning of the incidents. He stated that he verbally advised Raiford of his Miranda rights but Raiford did not make a statement at that time. Raiford knew that he was a police officer but asked what was going on.
Sergeant Richard Williams stated that Shirley Raiford was present the entire time when Darrin Raiford was given his rights, signed the rights of arrestee form, and made his statement. Darrin Raiford was not forced, threatened or coerced to give his statement according to the Sergeant. The officer agreed that Ms. Raiford had the opportunity to speak with her nephew, Darrin. Sergeant Williams agreed that he explained to Ms. Raiford what was going on.
Detective Duane Carkum was in the process of investigating the homicide. He agreed that Raiford was not forced, threatened or coerced to give a statement. Detective Carkum affirmed that from what he was able to observe, Raiford fully appreciated his rights, and that his aunt also fully appreciated what was going on.
The testimony of the detectives who were present when Raiford was given his rights and made his statement, shows that they were convinced that Raiford had voluntarily waived his Miranda rights. Deference should be given to the officers who were present and observed Raiford's demeanor.

Presence of Shirley Raiford
In State v. Fernandez, 96-2719 (La.4/14/98), 712 So.2d 485, the Louisiana *942 Supreme Court held that the determination of whether a juvenile knowingly waived his Miranda rights was based on consideration of the totality of circumstances standard applicable to adults, overruling State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied sub nom. Louisiana v.Dino, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). (Under Dino, a stricter standard on the admissibility of juvenile confessions was determined on whether or not an interested adult or attorney was present and engaged in a meaningful consultation with the defendant.) The presence of an interested adult or an attorney is a factor to consider under the totality of circumstances.
In State v. Johnson, 508 So.2d 953 (La. App. 4 Cir.1987), where the mother had the opportunity to engage in a meaningful conversation, this Court found that the opportunity was sufficient to satisfy the Dino requirements. In State v. Carter, 569 So.2d 1025, 1027 (La.App. 3 Cir.1990), writ denied, 575 So.2d 389 (La.1991). The Third Circuit stated that: "the Johnson court suggested that Dino would not exclude confessions where there was no actual consultation between the defendant and the interested adult, but merely the unexercised opportunity for such consultation." [Emphasis added.]
In the present case, Raiford was 16 years old at the time of the offense, and Shirley Raiford, his aunt, was present when he gave his statement. Sergeant Richard Williams affirmed that Shirley Raiford had the opportunity to talk to her nephew, Darrin Raiford, before his statement was taken. Detective Williams said that the aunt was aware that her nephew was under arrest for robbery. She was present during the entire statement. Although the officers did not say that Darren Raiford was arrested for murder, Sergeant Williams stated that Darren Raiford was informed that he was under investigation of other crimes.
In the transcript of Darrin Raiford's statement, the sergeant finished giving Darrin Raiford his Miranda rights, and the sergeant said:
Put your signature here. Also present in the giving of this statement is your aunt, this is your aunt, Shirley Raiford. Shirley Raiford is a black female, date of birth 8-9-57, also residing at 2853 N. Dorgenois Street, telephone number there is 944-3345.
Detective Carkum then questioned Shirley Raiford as follows:
BY DET. CARKUM:
Q. Ms. Raiford, do you know the subject we're talking to right now?
BY MS. RAIFORD:
A. Yes.
BY DET. CARKUM:
Q. And his name is?
BY MS. RAIFORD:
A. Darrin Raiford.
BY DET. CARKUM:
Q. And his relationship to you?
BY MS. RAIFORD:
A. Nephew.
BY DET. CARKUM:
Q. Okay did you have a chance to talk to Mr. Raiford, your nephew before, uh, we begin talking with him?
BY MS. RAIFORD:
A. Yes, I did.
BY DET. CARKUM:
Q. And do you understand his rights?
BY MS. RAIFORD:
A. ...... Uh .... didn't have to give a uh .... I don't have to sign anything ....
*943 When Ms. Raiford was concerned about whether she had to sign anything, Sergeant Williams focused on advising her of her nephew's rights again, and said:
Okay, the rights I advise[d] him was that he, he did not, he need not make any statements, that he have [sic] the right, he has the right to remain silent. Anything he say[s] could be used against him in a trial. He has the right to consult with and obtain the advice of any attorney. If he cannot afford an attorney, the court will obtain an attorney to represent and advise you. He has the right to have an attorney, or appointed attorney present at the time of any questioning, or giving of any statement. Do you understand the rights I just advise[d] you of? [Emphasis added.]
Ms. Raiford replied affirmatively. The following conversation took place:
BY SGT. WILLIAMS:
Q. Okay with that understand[ing,].... Darrin has advise[d] us that he wants to give us a statement?
BY MS. RAIFORD:
A. Okay.
BY SGT. WILLIAMS:
Q. Is that what you are going to allow him to do?
BY MS. RAIFORD:
A. Yes, yes, sir.
The defendant Raiford then gave his statement with his aunt present.
At the motion to suppress hearing, Shirley Raiford testified that she raised her nephew, Darrin Raiford, and he was in her custody for a while. Darrin, Shirley, and her brother lived at her father's house. When the police came, Shirley drove to the police station and met a man who told her that Darrin was in a lot of trouble. Shirley Raiford stated that the man said: "He was with some guys in a car. They did a drive-by shooting." Ms. Raiford continued: "he said that one of the guys, Preston or something like that, had expired." The officers led her to a room, and Ms. Raiford explained that "So they let me sat [sic] a few minutes with him." [Emphasis added.] She remarked that: "One of the detectives came in," indicating that they were not in the room with her and Darrin at first. During her testimony, the defense asked Ms. Raiford, "Did you, when you were in that room, have any conversation or talk to Darrin about whether you thought it was a good idea or not a good idea for him to talk to the police? Did you talk about that?" She answered, "No, because I was too upset." The defense attorney asked: "Did you discuss with him any rights he has under the law about making a statement or not making a statement?" She responded: "No. I didn't have that much time with Darrinwhen I went in the room." Although they did not discuss Darrin Raifford's waiver of rights, Ms. Raiford's testimony shows that they had the opportunity to discuss them.
Ms. Raiford said that the detective came in and "told me, say Darrin had told themthey have some information on Darrin, that Darrin was in the car, in the drive-by shooting. One of the boys died, and that was it. They start taking the information. They had a tablet, and they had a tape player. They told him about his rights." She stated that the detectives were talking fast. Ms. Raiford asked them to call Darrin's mother in Mississippi, but the attempt to reach her was unsuccessful.
Ms. Raiford testified that when the police came to her house that morning, an officer told her that Darrin had already made a statement. When asked why she had to go down to the police station, Ms. Raiford replied, "Because they needed *944 adults there, but he had said that Darrin had already confessed, telling him that he was implicated in it." [Emphasis added.] Ms. Raiford's testimony showed that she was aware of the murder and that Darrin was implicated in it.
Ms. Raiford agreed that she observed the detectives take Darrin Raiford's statement. She agreed that the police did not force, threaten or coerce Raiford to make the statement.

Conclusion Based on the Totality of Circumstances
Various factors as well as the experts' testimony are considered under the totality of circumstances standard to determine whether Raiford's statement was voluntary in the present case. Among them are:
(1) One factor to be taken into account is that the trial court granted Raiford's motion to suppress.
(2) Four of five experts opined that Raiford could not comprehend his waiver of the Miranda rights. However, the expert testimony was conflicting. Dr. Davis found that if Raiford could not understand his Miranda rights, then he did not have the capacity to proceed to trial and assist his attorney. Where the other four experts found that Raiford was competent to proceed to trial, it would follow that Raiford would have had the ability to understand his waiver of rights before making his statement according to Dr. Davis. The four experts felt that Raiford could not understand his rights independently; however, Raiford's aunt was present during the entire statement.
(3) The experts did not focus on the wording of Raiford's entire statement but only reviewed the beginning where Raiford was informed of his rights;
(4) Initially, when Raiford was arrested, the officer gave Raiford his Miranda rights. Raiford exercised his right to remain silent and did not make a statement at that time.
(5) The majority of experts agreed that it would be easier for Raiford to understand his rights if they were repeated a number of times. The police officers read Raiford his Miranda rights at least twice, once when he was arrested and again before he made his statement. The officer read the rights again to his aunt in Raiford's presence. The rights were on the waiver of rights form that Raiford signed. Raiford is presumed to have been given his Miranda rights when he was previously arrested on a prior charge.
(6) Raiford accurately recalled specific details of the crime scenes in his statement. The details are additional factors to be considered as indicators of his mental ability to understand the proceedings when he gave his statement;
(7) Shirley Raiford, a concerned adult, was present during the statement, and she and her nephew, Darrin Raiford, had the opportunity to discuss the matter before Darrin made his statement;
(8) An individual with average intelligence unfamiliar with legal terms might not understand the wording, "I wish to waive all privileges against self-incrimination." Some of the experts opined that Raiford would not understand the consequences in giving a statement where he could be charged for murder [as a principal] if he were present during the shooting. However, a factor to be taken into account is that ignorance of the law is not a defense;
(9) The experienced officers who were present during the statement testified that from his demeanor, Raiford appeared to understand his Miranda rights; and
*945 (10) Prior jurisprudence shows that Louisiana courts have found that various defendants, who have similar or lower I.Q.'s and learning disabilities resembling those of Raiford, gave statements that were voluntary under the totality of circumstances although the expert witnesses testified that the defendants could not understand the Miranda rights they waived.
Based on the above, I conclude that under the totality of circumstances, the defendant, Darrin Raiford's statement was given voluntarily as a matter of law. The trial court's ruling, in granting Raiford's motion to suppress his statement, is not supported by the evidence under the totality of circumstances.
Accordingly, I would reverse the ruling of the trial court, deny Raiford's motion to suppress his statement, and remand for further proceedings.
NOTES
[1] This writ pertains only to Raiford. Both defendants are also charged in case number 391-157 with car jacking and eight counts of armed robbery. The State did not include that case number on its cover sheet.
[2] The minute entry erroneously indicates that the defense gave notice; the transcript clearly shows the ruling was adverse to the State and the State gave notice.
[3] Nowhere in any of the motion hearings does a police officer testify that the defendant made any statements, except for the taped one which was the subject of the suppression hearing, and his brief remark at the time of his arrest that he did not know what was going on.
[4] Dr. Davis later clarified that he listened only to the portion of the tape pertaining to the waiver of rights.
[5] The State does make allegations regarding the facts of the cases but without supporting evidence, those allegations cannot be accepted as true.
[1] The defendant also offered the testimony of Dr. Mark Zimmerman (spelled Zimmermann in the Stewart opinion) as an expert in the field of psychology, substance abuse, and chemical dependency. The trial court refused to allow Dr. Zimmerman to testify or for the defense to present expert testimony on the inability of a retarded person who is intoxicated to form specific intent. The First Circuit held that:

[B]ecause the defendant did not enter a plea of not guilty and not guilty by reason of insanity, the trial court correctly ruled that the defense could not elicit expert opinion testimony regarding the defendant's mental capacity. La.C.Cr.P. art. 651; State v. Johnson, 475 So.2d 394, 397-398 (La. App. 1 Cir.), writ denied, 478 So.2d 143 (La.1985). Furthermore, Louisiana does not recognize the doctrine of diminished capacity. A mental defect or disorder short of legal insanity cannot serve to negate the necessary element of specific intent. State v. Pravata, 522 So.2d 606, 615 (La.App. 1st Cir.), writ denied, 531 So.2d 261 (La.1988). Stewart, supra, 633 So.2d at 934.
The First Circuit concluded that the trial "court would have allowed expert testimony, provided it was limited solely to a defense of voluntary intoxication and not combined with evidence of the defendant's mental capacity." Id., 633 So.2d at 935.
The First Circuit also upheld the trial court's ruling that Dr. Zimmerman could not testify on voluntary intoxication because he lacked enough information upon which to base his opinion. Dr. Zimmerman was not a medical doctor, and had not observed Stewart under the influence of cocaine. No evidence was introduced regarding the amount of cocaine that Stewart used or the amount of time between the drug use and the commission of the murder.
[2] Detective Michael Riley testified that: "at least one dog was brought to the scene, in an attempt to locate the second subject...."
[3] The defense asserts that after giving his statement, Raiford became more familiar with his case and his rights through discussions with his attorney and fellow inmates. Raiford himself stated that he could understand if the speaker did not use big words.